Filed 5/21/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| NORTH COAST RIVERS ALLIANCE ET AL., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> MARIN MUNICIPAL WATER DISTRICT BOARD OF DIRECTORS, <br><br>     Defendant and Appellant. | A133821, A135626 <br><br> (Marin County <br> Super. Ct. No. CIV 094809) |

The Marin Municipal Water District (the District) is the proponent of a project to build a seawater desalination plant in Marin County (the Project). The District certified an environmental impact report (EIR) for the Project. North Coast Rivers Alliance (the Alliance) challenged this action, claiming, among other things, that the EIR failed to analyze adequately the adverse environmental consequences of the Project. The trial court concluded the EIR was invalid under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] The District has appealed; we reverse the judgment.[2]

---

[1] All further undesignated statutory references are to the Public Resources Code.

[2] On our own motion, we consolidated the District's related appeal, challenging the attorney fees awarded to the Alliance. (*North Coast Rivers Alliance et al. v. Marin Municipal Water District Board of Directors* (A135626).) We now dismiss the A135626 appeal as moot in light of our reversal of the judgment.

# I. BACKGROUND

## A. *Overview of the Project*

The District is a public utility which provides water to residents in its service area in Marin County. (*Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1657.) In 1989, the District declared a water shortage emergency in its service area. (*Ibid.*) According to the District's Water Supply Master Plan, water demand will exceed supply by 2025. Faced with this impending shortfall, the District advocated aggressive conservation methods. However, even with vigilant conservation, the District's water demand will exceed its supply. The District and Marin County have long considered desalination as a feasible solution. Desalination is a process that removes dissolved minerals and other contaminants from seawater.

In August 2003, the District proposed to construct a 5 million gallon-per-day (MGD) desalination plant. Certain infrastructure would be oversized to accommodate potential expansion of the plant (10 MGD to 15 MGD). The desalination plant would extract raw seawater from San Rafael Bay and then would remove solids from the raw water by using reverse osmosis. The reverse osmosis process would produce potable water and a saline brine that would be discharged back into San Rafael Bay. The remaining brine would have a dissolved solids concentration about twice that of raw water. The brine would be discharged back to the San Rafael Bay by the existing Central Marin Sanitary Agency outfall, which treats municipal and industrial wastewater generated in central Marin County. The blending of the brine with the treated wastewater effluent would reduce the concentration of dissolved salts in the brine prior to its release into the Bay.

The desalination plant would be located on District-owned land in San Rafael. Bay water would be piped from an intake structure to be built at the end of the Marin Rod and Gun Club pier, which would be reconstructed to accommodate the new intake structure. In addition, the desalination plant would require construction of two reaches of pipeline, two pumping stations, and three storage tanks. The new tanks would include two 2-million-gallon tanks on San Quentin Ridge and another 2-million-gallon tank on a

ridge dividing Mill Valley and Corte Madera east of U.S. Highway 101 (the Ridgecrest A tank). The first pipeline reach would connect the desalination plant to the storage tanks on San Quentin Ridge. The second reach would connect the San Quentin Ridge tanks to the Ridgecrest A tank and then to the District's existing pipeline system.

*B. The EIR*

In November 2007, the District circulated a draft environmental impact report (DEIR) for the Project. The DEIR included a description of the Project generally as set out above. The stated objectives of the Project are "to provide high-quality, reliable potable water to help balance water supply and demand in [the District's] service area, including during emergencies and drought conditions, in a manner that is cost-effective, protects public health and safety, fulfills [the District's] service commitments, and minimizes environmental and community impacts." The DEIR analyzed impacts of up to a 15 MGD plant.

During the public comment period, over 100 individuals and organizations, including the Alliance, objected to the Project. Specifically, the Alliance objected to the Project's energy consumption, impacts on global warming, and growth-inducing effects.

In December 2008, the District released the final environment impact report (FEIR), which included a new Alternative 8 that would meet most of the Project's objectives while avoiding its impacts. In February 2009, the Board of Supervisors of the District (the Board) adopted Resolution No. 7869, certifying the FEIR.[3]

On August 19, 2009, following two public hearings, the Board adopted Resolution No. 7925, approving the 5 MGD desalination Project. This timely lawsuit by the Alliance followed. The trial court granted the Alliance's petition for writ of mandate, setting aside the Board's decisions certifying the EIR and approving the Project. The District[4] appealed.

---

[3]     We shall refer to the DEIR and the FEIR collectively as the EIR, except where differentiation between the two reports is required.

[4]     Unless otherwise noted, we shall refer to the District and the Board collectively as the District.

## II. DISCUSION

A.      *Standards of Review*

1.      Adequacy of the EIR

"The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 (*Laurel Heights I*).) "The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The EIR is therefore 'the heart of CEQA.' [Citations.] An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citation.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Id.* at p. 392.)

"In a case challenging an agency's compliance with CEQA, we review the agency's action, not the trial court's decision. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427.) In doing so, our 'inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' ([]§ 21168.5; see also *Vineyard Area Citizens for Responsible Growth, Inc., supra,* at pp. 426-427.)" (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th

4

1437, 1446-1447 (*Save Round Valley*).) In this context, substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a) (Guidelines).)

"We do not review the correctness of the EIR's environmental conclusions, but only its sufficiency as an informative document. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 (*Goleta Valley*).) 'We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. "Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' " [Citation.] We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements.' (*Ibid.*)" (*Save Round Valley, supra,* 157 Cal.App.4th at p. 1447.)

     2.    Exhaustion of Administrative Remedies

" 'No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance [] were presented to the public agency orally or in writing. . . .' (§ 21177, subd. (a).)" (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535 (*Sierra Club*).) " 'The essence of the exhaustion doctrine is the public agency's opportunity to receive and respond to articulated factual issues and legal theories *before* its actions are subjected to judicial review.' " (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1138 (*Evans*), quoting *Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198.) Comments must express concerns so the lead agency has " ' " 'its opportunity to act and to render litigation unnecessary.' " ' " (*Sierra Club, supra,* 1623 Cal.App.4th at p. 535.) "The purposes of the doctrine are not satisfied if the objections are not sufficiently specific so as to allow the Agency the opportunity to evaluate and respond to them." (*Evans, supra,* 128 Cal.App.4th at

5

p. 1138.)  " '[R]elatively . . . bland and general references to environmental matters' [], or 'isolated and unelaborated comment[s]' " do not satisfy the exhaustion requirement. (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 527 (*CREED v. San Diego*).)  Rather, " '[t]he "exact issue" must have been presented to the administrative agency . . . .' " (*Sierra Club, supra,* 163 Cal.App.4th at p. 535.)  Requiring anything less "would enable litigants to narrow, obscure, or even omit their arguments before the final administrative authority because they could possibly obtain a more favorable decision from a trial court." (*Tahoe Vista Concerned Citizens v. County of Placer* (2000) 81 Cal.App.4th 577, 594.)

Exhaustion of administrative remedies is a "jurisdictional prerequisite." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 615 (*CNPS v. Rancho Cordova*).)  The petitioner has the burden of proof to show exhaustion occurred.  (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 909 (*Porterville Citizens*).)  Inasmuch as the issue of exhaustion is a question of law, "[a]n appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies." (*Sierra Club, supra,* 163 Cal.App.4th at p. 536.)

## B.     The EIR's Analysis of the Project's Aesthetic Impacts

The Project requires construction of three water tanks to store desalinated water— one on Tiburon Ridge (Ridgecrest A tank), and two on San Quentin Ridge.  The EIR concluded the construction of the Ridgecrest A tank would result in an insignificant impact on scenic vistas.  With respect to the San Quentin Ridge tank site, the EIR concluded the construction of the proposed tanks would have a significant visual impact. The EIR identified, and the District adopted, a mitigation measure that requires the District to develop and implement a landscaping plan to help shield the tank site from view.

### 1.     Ridgecrest A Tank

The trial court determined that substantial evidence did not support the conclusion that construction of the Ridgecrest A tank would result in an insignificant visual impact.

The trial court further ruled that the EIR was deficient for failing to discuss whether the Ridgecrest A tank was inconsistent with the Countywide Plan (Countywide Plan).

"An EIR must identify the 'significant environmental effects' of a proposed project. (§ 21100, subd. (b)(1); [] Guidelines, § 15126, subd. (a).) For purposes of CEQA, 'environment' means physical conditions existing 'within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance.' (§ 21060.5.) Thus, aesthetic issues, such as public and private views, are properly studied in an EIR to assess the impacts of a project. (§ 21100, subd. (d); *Ocean View Estates Homeowners Assn. Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402–403.) However, a lead agency has the discretion to determine whether to classify an impact described in an EIR as 'significant,' depending on the nature of the area affected. ([]Guidelines, § 15064, subd. (b); *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1357 [varying thresholds of significance may apply depending on nature of area affected].) In exercising its discretion, a lead agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting. ([]Guidelines, § 15064, subd. (b).) Where the agency determines that a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion. ([]Guidelines, § 15128.)" (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492-493 (*Mira Mar*).)

In analyzing the visual impacts of the construction of the Ridgecrest A tank, the EIR set forth the following standards of significance: "For the purposes of this EIR, the project would have a significant impact with regard to aesthetics if it would: [¶] [1.] Have a substantial adverse effect on a scenic vista. [¶] For this EIR, a scenic vista is defined as a publicly accessible viewpoint that provides expansive views of a highly valued landscape. A viewpoint that is accessible only from private property is not considered a scenic vista. [¶] [2.] Substantially damage scenic resources, including, but not limited to, trees, rock outcroppings, and historic buildings within a state scenic

7

highway. [¶] [3.] Substantially degrade the existing visual character or quality of the site and its surroundings. [¶] [4.] Create a new source of substantial light or glare that would adversely affect daytime or nighttime views in the area." (Italics omitted.)

Based on the threshold criteria for significance presented in the EIR, the District concluded that development of the Ridgecrest A tank would have no significant effect on "scenic vistas." As stated in the EIR, the Ridgecrest A tank would be approximately 25 feet tall by 120 feet in diameter. The EIR indicated that although the Ridgecrest Tank site is located in the Tiburon Ridge Open Space, the proposed tank would not be visible from the Tiburon Ridge Open Space "until hikers are almost upon the tank site, due to intervening topography." Additionally, as described in the EIR, there is "intervening topography between the tank site and Ring Mountain Open Space; however, the tank would be visible at a distance (i.e., approximately 2,000 feet) from the tank site within the Ring Mountain Open Space." However, due to the site location—which is "within a saddle on the ridge, mature trees lie to the north and east, and the view location would be approximately 2,000 feet away"—the Ridgecrest A tank "would not be visually imposing." Additionally, the EIR indicates that "[b]ecause of the site topography and vegetation on the north slope, the site is not very visible from the north, although the closest residential development is to the north. The site is also not very visible from any nearby residences to the south[,] west[, or] []east."

The EIR also included a visual simulation of the site, representing a "worst-case" aesthetic impact. From this vantage point, the Ridgecrest A tank "is slightly visible." Thus, the EIR concluded the development of the Ridgecrest A tank "would not degrade the visual character of this location."

Despite this detailed analysis, the Alliance contends the EIR failed to analyze adequately the visual impacts of the Ridgecrest A tank. The Alliance acknowledges that the substantial evidence test governs, but none of the cases it cites involves this standard of review. Rather, in each of the cases cited by the Alliance, the issue was not whether substantial evidences supported the agency's visual impact analysis, but whether the record contained a "fair argument" of a visual impact, necessitating the preparation of an

EIR.  For example, the Alliance cites to our opinion in *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 586 (*Bowman*), for the proposition that " '[a] project that interferes with scenic views has an adverse aesthetic effect on the environment.' "  In *Bowman*, however, we reviewed a challenge to a mitigated negative declaration (MND) and not an EIR.  (*Id.* at p. 580.)  Review of an MND " ' "involve[s] a question of law requiring a certain degree of independent review of the record, rather than the typical substantial evidence standard [applicable to EIRs] which usually results in great deference being given to the factual determinations of an agency." ' "  (*Baldwin v. City of Los Angeles* (1999) 70 Cal.App.4th 819, 842.)  In *Bowman*, we expressly rejected the relevance of a case addressing aesthetic impacts analyzed in an EIR.  (*Bowman, supra,* 122 Cal.App.4th at p. 589 ["Because an EIR was prepared in *Sequoyah Hills* [*Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704 (*Sequoyah Hills*)] . . . the decision is essentially irrelevant for our purposes"].)  So too here, because the cases cited by the Alliance involve the preparation of MNDs, those decisions are irrelevant to our task of reviewing the conclusion in the EIR that development of the Ridgecrest A tank would result in an insignificant visual impact.  (See *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 401-403 (*Ocean View*) [record contained fair argument that proposed reservoir cover would have significant impact on views from public trails, requiring preparation of EIR]; *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1604-1607 [photographs with story poles and testimony by surveyor constituted fair argument that proposed houses would block panoramic ocean views and degrade scenic vista]; *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 936-939 (*Pocket Protectors*) [testimony of residents and architects regarding extent to which housing project would degrade visual character of site required preparation of EIR].)

Where, as here, the agency prepares an EIR, the issue is whether substantial evidence supports the agency's conclusions, not whether others might disagree with those conclusions.  (*Pocket Protectors, supra,* 124 Cal.App.4th at p. 938, fn. 26 [acknowledging differing standard of review applicable to EIRs].)  Although the Alliance

9

conflates the issue, this distinction is crucial for purposes of our review. (See *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 243-244 (*Clover Valley*) [upholding EIR's conclusion that, although residential project on ridge-top would be visible, impact would be less-than-significant due to topography and existing visual character of area]; *Mira Mar, supra,* 119 Cal.App.4th at pp. 485, 492-494 [upholding EIR's conclusion that 96-unit condominium complex in coastal zone would not have a significant impact on views]; *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 375-376 (*Eureka*) [upholding EIR's " 'qualitative judgment' " that playground would not have significant aesthetic impact].)

For example, in *Clover Valley, supra,* 197 Cal.App.4th 200, the EIR acknowledged the visual character of the site would undergo a " 'high level' " of change, but concluded the impact on scenic vistas was less-than-significant due to a buffer between the valley floor and new homes, and because other residential uses existed in the area. (*Id.* at pp. 243-244.) Rejecting an adjacent city's challenge, the court stated: "By containing factual statements addressing why this impact is not significant, the EIR provided substantial evidence supporting its conclusion . . . ." (*Id.* at p. 244; see also *Save Round Valley, supra,* 157 Cal.App.4th at pp. 1446-1447, 1469 [substantial deference is due to lead agency's aesthetic impact determinations in EIRs].)

In the instant case, the EIR included a detailed discussion of potential aesthetic impacts of development of the Ridgecrest A tank, including the size and shape of the tank, satellite image analysis of impacts from four directions, visual simulation, and impacts on vistas from homes and hiking trails and the highway. This analysis constitutes substantial evidence supporting the conclusion that the impact is less than significant. "In exercising its discretion, a lead agency must necessarily make a policy decision in distinguishing between substantial and insubstantial adverse environmental impacts based, in part, on the setting. [Citation.]" (*Mira Mar, supra,* 119 Cal.App.4th at p. 493.) Where an EIR contains factual evidence supporting the conclusion that aesthetic impacts will be insignificant, that conclusion must be upheld. (*Eureka, supra,* 147 Cal.App.4th at pp. 375-376; *Clover Valley, supra,* 197 Cal.App.4th at pp. 243-244.)

Courts " 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable.' " (*Mira Mar, supra,* 119 Cal.App.4th at p. 486.)

To summarize, the EIR addressed the possible visual impacts of the construction of the Ridgecrest A tank and concluded it would have a less than significant effect on the scenic vistas. This analysis was legally adequate. The Alliance's disagreement with the EIR's conclusions does not establish that the analysis which led to those conclusions was deficient. (*Marin Mun. Water Dist. v. KG Land Corp., supra,* 235 Cal.App.3d at p. 1663.)

2. San Quentin Ridge Tank Site

In an effort to mitigate the unavoidable significant visual impact of the San Quentin Ridge tank site, the EIR identified and the District adopted mitigation measure 4.1-3, which required the District to "work with a landscape architect and the cities of San Rafael and Larkspur" to develop and implement a landscaping plan to help shield the site from view. The EIR indicated that the landscape plan "will identify the location and types of planting (i.e., trees and shrubs) that will soften the visual intrusion of the tanks and identify success metrics such as survival and growth rates for the plantings."

The trial court, citing *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794 (*EHL*), ruled that the mitigation measure was indefinite and did not comport with CEQA because it did "no more than require a report be prepared and followed." The District argues that the Alliance failed to exhaust its administrative remedies concerning the adequacy of mitigation measure 4.1-3 and, in any event, the measure complies with CEQA.

We have reviewed the comment letters from the City of Larkspur and the City of San Rafael and conclude that the adequacy of mitigation measure 4.1-3 was raised. Specifically, in its letter the City of Larkspur commented on the mitigation measure associated with the San Quentin Ridge, noting that adequate discussion of "the mitigation" was "lacking." The City of Larkspur also faulted the proposed "landscaping plan to screen the tanks," stating that "[t]his mitigation measure seems to ignore that the

11

south side of the ridge was a quarry site and vegetation does not grow easily in the rock as is evidenced by the bare rock face on the site of the proposed tanks to the south." Similarly, the City of San Rafael noted its concern with the "unmitigated significant visual impact" of the proposed San Quentin Ridge tank site. In this comment letter, the City of San Rafael also attached its comments to the draft EIR, in which the city indicated that additional methods beyond those proposed in mitigation measure 4.1-3 needed to be explored. Specifically, the City of San Rafael noted that the draft EIR "concludes that the significant visual impacts of the proposed tanks cannot be mitigated, even with landscape planting due to the size and location of the tanks. The EIR must explore and evaluate other feasible mitigation measures, such as different construction methods or techniques, or different tank locations, including possible sites not on land owned by [the District]. The ability of the proposed site to grow screen vegetation should also be examined due to extensive bedrock."

The comments by the City of Larkspur and the City of San Rafael complied with the exhaustion requirement, as they sufficiently raised the issue regarding the adequacy of mitigation measure 4.1-3 and its proposed landscaping plan.

Turning to the merits, the trial court ruled that the mitigation measure was deficient because "it established no guidelines or criteria" to evaluate the adequacy of the landscaping plan. The trial court also found the plan to " 'soften' " the visual impact was a "vague metric that is difficult to quantify." The court faulted the District for failing to "commit[] itself to a landscaping plan that is designed to reduce the amount of the tank in view by 25%, 50%, or 75% [,]" and for failing to "oblige [itself] to participate in a management plan for replanting shrubs and trees if [the proposed success metric] is not met." Based on these reasons, the trial court found the mitigation did not comply with CEQA because it was "indefinite" and "does no more than require a report be prepared and followed." (*EHL, supra,* 131 Cal.App.4th at p. 794.)

We disagree with the trial court's analysis. As we explained in *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906 (*Oakland Heritage*): " '[I]t is improper to defer the formulation of mitigation measures until after project approval;

instead, the determination of whether a project will have significant environmental impacts, and the formulation of measures to mitigate those impacts, must occur *before* the project is approved.' ([*CNPS v. Rancho Cordova, supra,*] 172 Cal.App.4th [at p. 621], citing *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296 (*Sundstrom*), and *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, [ ].) However, 'when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts, the agency does not have to commit to any particular mitigation measure in the EIR, as long as it commits to mitigating the significant impacts of the project. Moreover, . . . the details of exactly how mitigation will be achieved under the identified measures can be deferred pending completion of a future study.' (*CNPS* [*v. Rancho Cordova, supra,*] 172 Cal.App.4th at p. 621, citing *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011 (*SOCA*).) As explained in *SOCA,* ' "for [the] kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process . . ., the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated. [Citations.]" ' (*SOCA, supra*, 229 Cal.App.3d at pp. 1028–1029.)"

Applying these standards, we conclude the District did not improperly defer mitigation. The EIR stated "[t]he plan would include monitoring and maintenance to ensure that the landscaping would provide an effective visual screen." The District has committed itself to work with the cities of San Rafael and Larkspur to "reduce the visual contrast of the tanks on the ridge top." In furtherance of the goal of reducing the visual impact of the tanks, the District said it will "implement the landscaping plan during [the] project construction[,]" which "will identify the location and types of plantings . . . that will soften the visual intrusion . . . ." The District also obliged itself to "identify success metrics such as survival and growth rates for the plantings."

Here, unlike in *EHL, supra,* 131 Cal.App.4th 777, the mitigation measure does not fail for indefiniteness. In *EHL*, the mitigation measure was deemed inadequate, where it purported to address possible construction noise by requiring that the project applicant submit future acoustical analyses to demonstrate, to the county's satisfaction, that structures were designed to "meet 'exterior and interior noise standards.' " (*Id.* at 793-794.) The court declared the measure "inadequate" because "[n]o criteria or alternatives to be considered [were] set out." (*Id.* at 794.) The court explained that the "mitigation measure [did] no more than require a report be prepared and followed, or allow approval by a county department without setting any standards[,]" and it was therefore illegal deferred mitigation. (*Ibid.*)

Contrary to the Alliance's contention, mitigation measure 4.1-3 is sufficient, since it commits the District to mitigation and sets out a standard for the landscaping plan to follow, to wit: to reduce and soften the visual intrusion of the tanks. (See, e.g., *Clover Valley, supra,* 197 Cal.App.4th at p. 244 [upholding mitigation measures to be imposed at design stage that would "minimize" project's visual impacts]; *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1126-1127 [upholding mitigation measure requiring lighting be designed so as to avoid adjacent properties], *EHL, supra,* 131 Cal.App.4th at p. 794 [upholding dirt hauling plan to "assure public safety" during construction].) This mitigation measure appears to us to fall squarely within the rule of *CNPS* that "when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts," and has committed to mitigating those impacts, the agency *may defer precisely how mitigation will be achieved* under the identified measures pending further study. (*CNPS v. Rancho Cordova, supra,* 172 Cal.App.4th at p. 621, see also *National Parks & Conservation Assn. v. County of Riverside, supra,* 71 Cal.App.4th at p. 1366 [deferring design of fencing to protect species].)

In sum, the District has evaluated the potentially significant visual impacts of the tanks, has identified a landscaping plan with the goal of creating a "visual screen" to "minimize" the contrast between the tanks and the ridge top, and has committed itself to

14

implement, monitor, and maintain the landscaping.  Although the specific details of how mitigation will be achieved under the landscaping plan is deferred until the construction phase, the EIR gives adequate assurance that visual impacts will be mitigated by the selection and location of appropriate plantings.  Accordingly, we conclude mitigation measure 4.1-3 was sufficient.

*C.      The EIR's Analysis of the Project's Impact on Land Use and Planning*

The trial court determined that the EIR violated CEQA because it did not discuss whether the Ridgecrest A tank was "inconsistent with the Countywide Plan."  The District argues that the Alliance failed to exhaust its administrative remedies concerning the consistency of the Ridgecrest A tank with the Countywide Plan and, in any event, substantial evidence supported the EIR's analysis.  We agree.

To satisfy the exhaustion requirement, comments must be "sufficiently specific so as to allow the [a]gency the opportunity to evaluate and respond to them."  (*Evans, supra,* 128 Cal.App.4th at p. 1138.)  At trial, the Alliance argued the EIR did not contain an adequate analysis of consistency of the Ridgecrest A tank site with various policies and programs in the Countywide Plan.  The Alliance claimed the EIR failed to analyze conflicts with policies in the Countywide Plan regarding "open space stewardship" (Open Space Policy 2.2) and the "preservation of visual quality"  (Community Design Policy 4.1).  The Alliance also cited four programs designed to implement the goal of protecting visual quality in Marin County (DES-4.a " 'Protect Key Public Views,' " DES-4.b " 'Minimize Visual Impacts of Public Facilities,' " DES-4.c " 'Protect Views of Ridge and Upland Greenbelt Areas,' " and DES-4.d " 'Protect Views of Ridgelines.' ")  In response, the District asserted that no commenter raised the issue of consistency with the policies and programs in the Countywide Plan during the administrative process, and that the trial court did not need to reach this issue due to the failure to exhaust administrative remedies.  The trial court disagreed, ruling that the Alliance had exhausted its administrative remedies on this issue.

We have reviewed the comment letters from the City of Larkspur, the City of San Rafael, the Town of Tiburon, Marin County Community Development Agency, and the

15

Marin County Parks and Open Space Department. Even giving them a generous interpretation, the issue of inconsistency with specific Countywide Plan policies and programs was not presented to the District and, thus, it did not have the opportunity to evaluate and respond to this alleged CEQA violation. (*Porterville Citizens, supra,* 157 Cal.App.4th at p. 910.)

The letter from the City of Larkspur, and the letter from the City of San Rafael, each comment on the San Quentin Ridge tank site, not the Ridgecrest A tank site. Similarly, the letter from the Marin County Community Development Agency fails to address the Ridgecrest A tank site.

To the extent the letter from the Town of Tiburon addresses the Ridgecrest A tank site, it states that the tank is "located on publicly-owned open space land," which "automatically creates a conflict between [the District] and the public agencies which hold the open spaces in public trust for uses that are incompatible with [the District's] proposed use." The letter did not apprise the District of any specific inconsistencies with policies or programs in the Countywide Plan. Rather, the letter asked the District to consider alternative sites not designated as open space. The letter also asked the District to revise its mitigation measures so that replacement open space land would be located within Tiburon, and that the town be consulted in identifying suitable replacement land. In response, the District described its efforts to find another tank site and revised its mitigation measures as requested.

Two comments in the letter from the Marin County Department of Parks and Open Space stated that placing the tank at the Ridgecrest A site would impact land designated as open space in the Countywide Plan, and it requested that the District revise its proposed mitigation measure. The District responded, by acknowledging the impact to County-designated open space, and by revising the mitigation measure as requested.

In any event, even if issues concerning consistency with the Countywide Plan and its specific policies and programs had been raised during the administrative process, the EIR's analysis regarding land use and planning at the Ridgecrest A tank site is supported by substantial evidence. Determining whether a project is consistent with general plan

16

policies is left to the lead agency; "[i]t is, emphatically, *not* the role of the courts to micromanage" such decisions. ([*Sequoyah Hills, supra,* 23 Cal.App.4th at p. 719]; *San Franciscans Upholding The Downtown Plan v. City and County of San Francisco* (2002) 102 App.4th 656, 677.) " '[W]hile there is no requirement that an EIR itself be consistent with the relevant general plan, it must identify and discuss any *inconsistencies* between a proposed project and the governing general plan. [Citation.]' [Citations.] 'Because EIRs are required only to evaluate "any *inconsistencies*" with plans, no analysis should be required if the project is *consistent* with the relevant plans. [Citation.]' [Citation.]" (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 918-919 (*Long Beach*).)

Here, the EIR stated that, with the exception of the designation of the Ridgecrest A tank site as open space under the Countywide Plan, the Project is consistent with applicable land-use policies. Specifically, the EIR acknowledged the Ridgecrest A tank's land-use and open space impact, identified a mitigation measure of providing replacement open space, and stated the Project is otherwise consistent with applicable plans. Nevertheless, the trial court faulted the EIR for failing to mention "the specific elements or policies of the Countywide Plan that would be affected" by the Ridgecrest A tank.

The trial court's ruling is tantamount to requiring the EIR to provide a detailed discussion of the Project's consistency with the plan. CEQA includes no such requirement. (*Long Beach, supra,* 176 Cal.App.4th at p. 919 [lead agency's "responses explained that no inconsistency exists, with the result that it is not required to discuss the [applicable] general plan in the FEIR"].) Here, the EIR concluded the Project as mitigated was consistent with the Countywide Plan, and it adequately responded to the Parks Department's letter. CEQA requires nothing more. (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552,1568 ["EIR provided a satisfactory response to a public comment on general plan conformity" because the response "contain[ed] a similar level of detail as the comment"].)

17

D.      *The EIR's Seismology Analysis*

With respect to the Project's seismic impacts, the trial court ruled that the EIR "does not discuss what happens if the soils liquefy in the event of an earthquake, nor does the [EIR] explain the health and safety impacts if the Project suffers structural damage from an earthquake.  [The EIR's] response did not address the principal concern of [a] commentator about what happens to the plant, i.e. the water supply, in the event of damage from an earthquake."

The District argues that the Alliance failed to exhaust its administrative remedies with respect to the adequacy of the EIR's seismology analysis and, in any event, substantial evidence supports the EIR's analysis.  The challenged comment was raised by a resident at one of the public hearings, in which the resident asked, "Is anybody concerned about earthquakes . . . .  What are you going to do in case we have an earthquake?  What's going to happen to that plant?  What will happen to all of our reservoirs?"  Although this comment highlighted a general concern about earthquakes and the water supply, nothing remotely suggests that soil liquefaction was a principal concern of the commentator.  (See *CREED v. San Diego, supra,* 196 Cal.App.4th at p. 527 [" 'generalized environmental comments at public hearings', 'relatively . . . bland and general references to environmental matters,' [ ] or 'isolated and unelaborated comment[s]' [citation]" do not satisfy exhaustion requirement].)

In any event, substantial evidence supported the EIR's seismology analysis.  As mentioned, the trial court ruled the EIR's "failure to provide information" regarding liquefaction and health and safety impacts related to earthquakes violated CEQA.  The EIR, however, did analyze these issues.  Specifically, the EIR and supporting record included detailed information on geologic conditions in the area, and considered the potential for seismic hazards including ground shaking and liquefaction.  The EIR also considered seven potential impacts associated with geologic risks.  "No facilities are located within an Alquist-Priolo Zone," and the potential for surface faulting is less than significant.  The EIR estimated "[p]eak horizontal ground acceleration in the area" and concluded peak levels could impact "poorly constructed structures."  The EIR required

18

"site-specific ground motions [studies] for all project features" and determined that risks from ground shaking would be insignificant because all facilities must be "constructed at a minimum to the seismic design requirements for ground shaking specified in the Uniform Building Code for seismic zone 4. Additionally, in order to satisfy the provisions of the 1998 California Building Code, [the Project must] be designed to withstand ground motions equating to approximately a 500-year return period (10 percent probability of exceedance in 50 years)."

With respect to liquefaction, the EIR stated that a "program of site-specific exploratory borings and accompanying laboratory tests would be conducted in order to delineate any potentially liquefiable materials underneath the proposed plant site prior to foundation design. Potentially liquefiable deposits would either be removed or engineered (dewatered, or densified) to reduce their liquefaction potential." "By either removing or engineering any liquefiable soils or properly designing and constructing the deep-pile foundations for the proposed facilities, impacts from construction on potentially liquefiable soils would be less than significant."

The DEIR not only included a detailed discussion of earthquake impacts, but the final EIR provided further discussion concerning earthquake safety. Specifically, the EIR indicated that hazardous material storage would be "designed to meet seismic standards." The EIR also required the Project to include "structural double containment, including special designs to assure containment integrity in the event of [an] earthquake." The EIR further explains that in the event of an emergency such as "damage from an earthquake . . . the desalination plant would be [] shut down." In the event of damage, the District "would rely on its other water resources to supply water and, if necessary to address an emergency, implement the water rationing programs described in the 2005 [District] Urban Water Management Plan, as amended in November 2007."

"[T]he fact that [the Alliance] disagree[s] with the responses . . . does not render the responses inadequate." (*Ballona Wetlands Land Trust v. City of Los Angeles* (2011) 201 Cal.App.4th 455, 476 (*Ballona Wetlands*.) We are guided in our analysis by our opinion in *Oakland Heritage, supra,* 195 Cal.App.4th 884. As pertinent here, in *Oakland*

19

*Heritage*, we considered whether substantial evidence supported an EIR's conclusion that mitigation measures reduced the effects of ground shaking and liquefaction impacts to a less than significant level. (*Id.* at p. 898-903.) There, we determined there was "no abuse of discretion in a conclusion that conformity with the current building standards . . . in conjunction with [] other require[d] [future studies], adequately mitigated the seismic impacts of the project." (*Id.* at p. 905, fn. omitted.) "Although final design of the structures, including seismic safety design, is deferred until a later date, the Revised EIR gives adequate assurance that seismic impacts will be mitigated through engineering methods known to be feasible and effective." (*Id.* at pp. 911-912.)

Similarly here, the relevant provisions of the Building Code are intended to promote structural safety in the event of an earthquake. (See Cal. Code Regs. 2010, tit. 24, § 1613.1.) Moreover, the EIR and supporting record included detailed information on geologic conditions in the area, and considered the potential for seismic hazards including ground shaking and liquefaction. Nothing more was required. (See *Long Beach, supra,* 176 Cal.App.4th at p. 901 ["[t]he level of detail required in a response to a comment depends on factors such as . . . the level of detail of the comment, and the extent to which the matter is already addressed in the DEIR or responses to other comments"]; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 373 [CEQA does not require lead agencies "to engage in speculation in order to analyze a 'worst case scenario' "].)

In sum, the EIR's seismology analysis more than adequately responded to the generic comment expressing "concern[] about earthquakes."

E.      *The EIR's Analysis of Hydrology and Water Quality Impacts*

        1.      Background

The EIR evaluated whether liquid wastes from the Project would result in potentially significant hydrology or water quality impacts. The significance criteria used to analyze this potential impact included whether such wastes would "[v]iolate any water quality standards or [waste discharge requirements]" or "[o]therwise substantially degrade water quality." The EIR concluded the impact was insignificant because

20

"wastewater would be treated to comply with [] existing permit limits and would not exceed any discharge limits designed to protect Bay water quality." The EIR also stated: "Periodic shock chlorination of the intake pipe would control bio-growth on a semi-annual to annual basis. . . . A 6-inch pipeline would be used to deliver chlorine solution to the intake pipeline and circulate the solution as well as to assist in pipeline cleaning operations. The chlorinated wastewater generated by shock chlorination would be sent to the desalination facility and would be neutralized with bisulfite in the pretreatment system or directed to the solids handling system."

The EIR stated that depending on the amount of bio-fouling organisms (primarily barnacles and mussels) that enter the feed water intake system, "it may be necessary to periodically disinfect the intake system. This operation would be performed by introducing approximately 150 gallons of bleach (sodium hypochlorite) into the intake. If necessary, a pipeline cleaner (pipeline pig) would be introduced into the intake line on a periodic basis . . . ."

At trial, the Alliance argued that the EIR failed to analyze the potential adverse impact to the Bay from cleaning the intake pipe system through " 'shock-chlorination.' " The trial court ruled that the EIR failed to respond adequately to comments raised by the Baykeeper organization and by the California Fish and Game Department (CDFG). Baykeeper expressed its concerns that the proposed shock-chlorination would release "toxic chlorine compounds into the Bay. The project proposal states that this will only happen twice per year, however, in the pilot project, chlorination was done much more frequently (every six to eight weeks). This would be a worrisome contribution of chlorine to the local receiving waters. The [District] is also proposing to use anti-fouling paints in the intake pipe, which can contribute significant amounts of copper and nickel to the surrounding water column." Baykeeper was also concerned about the "disposal of the assorted (but unidentified) cleansing agents into the sewer system . . . . It is not clear that Marin's wastewater treatment facility is capable of removing these detergents, surfactants, biocides and chelating agents from the wastewater stream. . . . The proposal does not currently describe the quantity or the nature of the agents in question."

21

In response, the EIR stated: "The saltwater intake pipeline is proposed to be shock-chlorinated as required to preserve hydraulic capacity. For this procedure, the pipeline would be isolated with valves to preclude the escape of chlorinated water to the environment. Prior to start-up, the water would be dechlorinated using sodium bisulfite in the same manner as wastewater discharges are safely dechlorinated to protect aquatic life. Contrary to the comment, 'anti-fouling paints in the intake pipe' would not be used." The EIR also responded to the comment's "concern regarding products used to clean and maintain the microfiltration (MF), ultrafiltration (UF), or reverse osmosis (RO) membranes." Specifically, it was noted that the 2007 Engineering Report for the Desalination Pilot Report by Kennedy/Jenks (Engineering Report), which was attached as an exhibit and circulated with the EIR, provided a "detailed discussion on the MF/UF and RO system Clean-In-Place (CIP) wastes." The EIR also referenced "Technical Memorandum No. 9," which was part of appendix 1 and available in an online format, as well as on compact disc. According to the EIR, "[t]he nature of the cleaning chemicals used by the MF/UF process and the quality of the spent CIP solutions indicate that discharge of neutralized CIP wastes to the sanitary sewer and to the [Central Marin Sanitary Agency] [(CMSA)] plant for treatment should be acceptable. CMSA reviewed Technical Memorandum No. 9 and commented that based on the agency's current discharge permits, the CIP wastes would be acceptable for discharge to the sanitary sewer and treatment at CMSA's treatment plant."

In its comment, CDFG expressed its concern that the draft EIR "faile[d] to discuss bio-fouling of the intake lines and methods to control bio-fouling organisms." CDFG further noted that during the District's "pilot project, bio-fouling was controlled by filling the intake pipe every six weeks with a chlorine mixture to kill bio-fouling organisms." Citing Fish and Game Code section 5650, CDFG asserted that "[c]hlorine [cannot] be discharged into San Francisco Bay waters due to its toxicity to aquatic life . . . . Therefore, the [final] EIR needs to address the issue of bio-fouling and discuss mitigation measures to prevent adverse effects, as well as, alternative methods for bio-fouling." In response, the EIR noted: "Section 3.4.4.5 discusses potential biofouling control methods,

including chlorination of the intake system.  The chlorinated water would not be discharged without first being treated and dechlorinated to meet all standards set in the discharge permit that would be issued by the Regional Water Quality Control Board (RWQCB)."

2.      Analysis

The trial court ruled that the EIR did "not contain an adequate discussion of the frequency" of the shock-chlorination treatments and it lacked substantial evidence to support the District's "conclusion that untreated chlorinated cleaning water [would not] be discharged into the Bay."  This issue focuses on "the amount or type of information contained in the EIR . . . ."  (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1546.)  Under the substantial evidence standard, the "question is whether [the District] reasonably and in good faith discussed [shock-chlorination] in detail sufficient for the public to discern from the []EIR the 'analytic route the . . . agency traveled from evidence to action.' "  (*Long Beach, supra,* 176 Cal.App.4th at p. 902.)  Where, as here, "the agency determines that a project impact is insignificant, an EIR need only contain a brief statement addressing the reasons for that conclusion."  (*Clover Valley, supra,* 197 Cal.App.4th at p. 243, quoting *Mira Mar, supra,* 119 Cal.App.4th 477, 492-493, citing Guidelines, § 15128.)

In *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099 (*Amador Waterways*), for example, the petitioner argued the lead agency failed to comply with CEQA by omitting a discussion of a canal project's impacts on riparian habitats.  The court disagreed, explaining that the EIR's one-sentence statement that "riparian habitat will ' "continue to thrive along local streamcourses if canal leakage is eliminated" ' constitutes a valid statement of reasons for the Agency's significance determination."  (*Id.* at p. 1113, citing Public Resources Code, § 21100, subd. (c), and Guidelines, § 15128.)  Similarly, in *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383 (*AIR*), the court acknowledged that the EIR's discussion of kit fox habitat impacts was "brief," yet sufficient "[t]o enable the

23

public to discern the analytic route the agency traveled from evidence to action." (*Id.* at 1397.)

Thus, as *AIR*, *Clover Valley* and *Amador Waterways* instruct, CEQA does not require detailed analysis of an impact that is less than significant. The EIR in this case adequately discussed the impact of shock-chlorination and associated wastewater impacts. The EIR described the shock-chlorination process, its frequency, and wastewater disposal. The EIR evaluated whether wastewater produced by the Project could impact water quality. Applying the applicable significance standards, the EIR determined this impact would be less than significant. The EIR further explains "the bioassay testing that was conducted on brine generated in the Pilot Plant study" supports the conclusion that shock-chlorination chemicals would not cause toxicity in receiving waters. This explanation was sufficient.

Substantial evidence elsewhere in the record provides further support. (See *Amador Waterways, supra,* 116 Cal.App.4th at p. 1113 [reviewing entire administrative record].) To the extent the Alliance suggests that the District cannot rely on evidence outside the EIR itself, it is mistaken. As stated in *Amador Waterways,* when an EIR contains a brief statement of reasons for concluding an impact is less than significant, then the petitioner has the burden of demonstrating "the conclusion was not supported by substantial evidence *in the administrative record*." (*Amador Waterways, supra,* 116 Cal.App.4th at p. 1113 (italics added).)

Here, the EIR concluded that the "same maintenance procedures [used during the pilot study] would be used to prevent build-up" during Project operation. Technical Memorandum No. 9, prepared by Kennedy/Jenks for the pilot study, described in detail these procedures, including adding chlorine, neutralization, and sampling protocols. For the pilot study, shock-chlorination cleaning was not needed for the first three months. Thereafter, cleaning occurred every six to eight weeks to maintain flow rates. No clogging was observed. At the end of the study, Kennedy/Jenks "recommend[ed] periodic shock chlorination of the intake pipe for a full scale facility to control bio-growth. . . . [as] semi-annual to annual events." Kennedy/Jenks explained that the full-

24

scale facility would require less frequent cleaning than pilot operations.  No chlorine uptake or damage was observed during the year-long pilot study.  Kennedy/Jenks' conclusions derived from operation of the year-long pilot program constitute substantial evidence.  (§ 21082.2, subd. (c) [substantial evidence includes "expert opinion supported by facts"].)  This study is substantial evidence supporting the conclusion that the cleaning process can be operated safely.  (*Porterville Citizens, supra,* 157 Cal.App.4th at p. 903 ["[t]he absence of evidence of adverse impact" is evidence no impact will occur]; *Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, pp. 925-926 ["circumstantial evidence, the absence of evidence to the contrary, plus the presumption that official duty was regularly performed," constitutes substantial evidence].)

In sum, the EIR adequately discussed the issue of shock-chlorination, explained the process, and discussed why disposal of the wastewater would not cause a significant impact.  Substantial evidence in the administrative records supports the EIR's conclusion that chlorinated water would not be discharged into the Bay.

F.      *The EIR's Analysis of the Project's Impacts on Biological Resources*

1.      Entrainment Analysis

The EIR defines entrainment as "the direct uptake of aquatic organisms by the suction field generated at the desalination plant water intake."  At the intake, the plant will pump raw water from San Rafael Bay through a newly constructed intake pipeline.  During the pilot program the District's consultants studied the effects of entrainment in the pipeline.  The EIR analyzed whether fish or other aquatic life would be trapped by the suction at the intake.  The EIR concluded impacts from entrainment were not significant.

The trial court concluded the evaluation methodology was inadequate because it did not follow the recommendations of CDFG and National Oceanic and Atmospheric Administration (NOAA) Fisheries, which noted that the amount of source water sampling was insufficient to estimate accurately the population of the species examined.  The court further determined that the District needed a "good reason" to deviate from the standard environmental protocol of full-year source water sampling.

25

" '[A]n EIR need not include all information available on a subject' . . . [all that is required is] sufficient information and analysis to enable the public to discern the analytical route the agency traveled from evidence to action." (*AIR, supra,* 107 Cal.App.4th at p. 1397.) "A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary." *(Laurel Heights I, supra,* 47 Cal.3d at p, 415.) "Although others might well assess the significance of [a] risk . . . differently, it [is] error for the court to substitute its judgment for that of the Agency." (*Sonoma County Water Coalition v. Sonoma County Water Agency* (2010) 189 Cal.App.4th 33, 56 (*SCWC*).)

The EIR's standard for entrainment impacts for a non-special status species is whether the Project will "cause a fish or wildlife population to drop below self-sustaining levels . . . ." In analyzing these impacts, the District undertook a year-long source water sampling program "to collect information on the species composition of fish and macroinvertebrates from the immediate project vicinity." "The sampling employed a variety of collection techniques designed to sample various habitats and lifestages of fish and macroinvertebrates within the proposed project area." These sampling techniques included (1) 500 micrometer mesh plankton nets, (2) otter trawls, (3) Kodiak trawls, (4) crab traps, (5) beach seine nets, (6) traps sampling for juvenile fish, (7) crayfish traps, and (8) baited long-lines. The year-long study collected no chinook salmon, green sturgeon, or their larvae and only one steelhead. The District also considered fish sampling performed by CDFG "within the general area of the proposed project on approximately a monthly basis since 1980." "The data collected by both the field survey and by CDFG show similar species composition for the proposed project area as well as similar percent composition of [various species for the] total sample."

Field sampling is often the sole evidence relied on by lead agencies in evaluating a project's biological impacts. (*AIR, supra,* 107 Cal.App.4th at p. 1398 [upholding an EIR's biological impact conclusion because record established agency's expert reviewed relevant databases, "then conducted a field study, after which she analyzed her findings

26

and prepared a written report"]; *Save Round Valley, supra,* 157 Cal.App.4th at pp. 1467-1468 [rejecting challenge to agency's data-gathering efforts]; Guidelines, § 15151.) Under the substantial evidence standard of review, the District's initial sampling effort was more than adequate.

Nevertheless, the District went further and elected to proceed with a year-long "pilot-scale desalination program (Pilot Plant). The operation of the Pilot Plant, with a seawater intake in San Rafael Bay, provided the opportunity to make direct quantitative measurements of larval fish and eggs drawn into (entrained) the intake along with the plant feedwater." The District developed this study "in coordination with CDFG and NOAA Fisheries." As part of the study, "[s]ampling of fish eggs and larvae entrained at the intake screen was . . . conducted for a full 12-month period." During entrainment sampling, plankton nets were suspended in the intake holding tank so that 100 percent of the intake flow was filtered through the nets. "Sampling was conducted every other week from July 8, 2005, to June 21, 2006, and included both daytime and nighttime sampling . . . ."

The EIR summarized the study's results, which revealed that pacific herring, northern anchovy, and yellowfin goby comprised roughly 98.5 percent of entrained fish larvae. "No chinook salmon, steelhead, or green sturgeon larvae were entrained . . . ." The EIR reflected that this data is consistent with lifecycle history for these species. Chinook salmon, steelhead, and green sturgeon "spawn upstream in freshwater, and no larval forms of these species are expected to occur in this area of the Bay. Adults and outmigrating young-of-the-year may pass through the area but would be too large to be entrained." Thus, chinook salmon, steelhead, or green sturgeon "would not likely be subject to entrainment."

The District also performed concurrent source water sampling during February and March 2006. This sampling enabled the District to "calculate the proportional mortality caused by entrainment over that period using [empirical transport modeling, or 'ETM']"—an estimate of percentage of organisms entrained as a proportion of total number of organisms present in the source water. In comments on the DEIR, NOAA

27

Fisheries and CDFG criticized this aspect of the District's pilot study. Both agencies said the District should have conducted "monthly source water sampling" over at least a year, not just in February and March.

The District responded in the FEIR, explaining that February and March were chosen for source water sampling because these months represent peak abundance periods for important species, such as pacific herring. The District further explained that given the utilization of peak performance periods, using this data to annualize entrainment losses "overestimates impacts [] and . . . represents a worst-case scenario . . . ." The entrainment study supported this conclusion. The data shows the peak period for entrainment during the year-long study occurred in March. Thus, the EIR explained that "[t]he results of the February and March entrainment samples accurately represent the majority of the most commonly entrained larvae in the Bay during the season of their greatest abundance."

Additionally, the EIR explained that "[t]he reason for not conducting the year-long source water sampling was the lack of agreement from [CDFG and NOAA Fisheries] that, even if a year-long source water sampling study were conducted, data from the study would be accepted for the purposes of permitting the full-scale desalination plant." The EIR further explained that "source water sampling is costly because significant laboratory research is required to examine the samples and identify the types of organisms collected and their population percentages." Thus, "[g]iven the study's high costs, [the District] believed that the cost of the source water sampling was disproportional to the Pilot Program as a whole." Moreover, after the District submitted the final plan to CDFG and NOAA Fisheries, omitting the suggested year-long source water sampling, neither agency commented on the plan. The EIR concluded the methodology used and data obtained during operation of the Pilot Plant represented "the best data available on which to base" the entrainment analysis.

The District used the results of the entrainment study and source water sampling to calculate potential population level impacts of full scale operation using "[t]hree different population models . . . Empirical Transport Model, Adult Equivalent Loss [], and

28

Fecundity Hindcast [].” The EIR described each model and summarized the results. The EIR also acknowledged that the District would need to obtain “all necessary environmental permits and approvals, including any necessary incidental take authorizations from U.S. Fish and Wildlife Service (USFWS), NOAA Fisheries, and/or CDFG should the project move forward.” The EIR explained that, during future consultations, federal permitting agencies could require the District to provide habitat compensation because the Pacific Fisheries Management Council has designated the Central San Francisco Bay as an Essential Fish Habitat, and that federal agencies could require the District to perform additional source water sampling as part of that effort. The District emphasized that by annualizing peak entrainment data and assuming maximum plant operation, its results were conservative.

Despite this in-depth analysis, the Alliance argued, and the trial court agreed, that the EIR was inadequate due to the District’s failure to follow agency recommendations to perform a year-long source water sampling. This ruling ignores the substantial evidence standard of review. This standard applies to disagreements concerning “the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied.” (*Long Beach, supra,* 176 Cal.App.4th at p. 898.) “The fact that different inferences or conclusions could be drawn, or that different methods of gathering and compiling statistics could have been employed, is not determinative in a substantial evidence review.” (*Evans, supra,* 128 Cal.App.4th at p. 1148.) The issue is not whether other methods might have been used, but whether the agency relied on evidence that a “ ‘reasonable mind might accept as sufficient to support the conclusion reached’ ” in the EIR. (*SCWC, supra,* 189 Cal.App.4th at p. 41; *AIR, supra,* 107 Cal.App.4th at p. 1398 [“ ‘CEQA simply requires . . . adequate information to ensure that “decisions be informed, and therefore balanced” ’ ”].)

Moreover, “[p]ointing to evidence of disagreement with other agencies is not enough to carry the burden of showing a lack of substantial evidence to support [an agency’s CEQA] finding[s].” (*CNPS v. Rancho Cordova, supra,* 172 Cal.App.4th at p. 626.) For example in *CNPS v. Rancho Cordova*, petitioner cited disagreements

between the lead agency and " '[t]he state and federal agencies with the requisite expertise, and jurisdiction by law, over [listed species] . . . .' " (*Id.* at pp. 625-626, fn. omitted.) These agencies " 'unanimously informed the [lead agency] that, in their professional judgment, and based on their expertise and the facts before them . . . [the Project] would result in significant impacts to, and loss of listed species and habitats upon which they depend.' " (*Id.* at p. 626.) Rejecting the petitioner's claim, the court held "the burden was on [petitioner] to affirmatively show there was no substantial evidence in the record to support the [lead agency's] findings, and [petitioner] could not carry that burden by simply pointing to portions of the administrative record that favored its position." (*Ibid.,* italics omitted.) Because substantial evidence supported the agency's conclusions, they were upheld, notwithstanding the other agency's difference of opinion. (*Ibid;* see also *AIR, supra,* 107 Cal.App.4th at pp. 1396-1397 [agency did not need to perform surveys according to guidance issued by USFWS to constitute substantial evidence]; *Greenebaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391, 413 [difference of opinion among experts does not invalidate EIR].) The same is true here.

The court's role is not to " ' "weigh the evidence adduced before the agency or substitute its judgment for that of the agency." [Citation.]' " (*SCWS, supra,* 189 Cal.App.4th at p. 42.) Rather, our, inquiry "in reviewing the [a]gency's exercise of its discretion, is to . . . ' " ' " 'ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute . . . ' " ' " 'giving appropriate deference to the [a]gency's authority and presumed expertise. [Citation.]" (*Id.* at p. 62.)

In sum, the record shows substantial evidence supported the EIR's analysis. NOAA Fisheries and CDFG objected; they wanted the District to obtain more data. The District responded, explaining the impracticality of further sampling. Such differences of opinion do not mean the EIR was invalid. The trial court erred in concluding otherwise.

2. Environmental Setting Description

The trial court determined that the EIR's description of the environmental setting was insufficient, stating the District "should have included a description of the age and

30

types of [the] species that are likely to be found in the project area. It is not enough of a baseline to note that these fish use the Central Bay/San Rafael Bay to migrate to and from spawning grounds in the more northern rivers." The court also concluded that the District's two-month water sampling did not provide enough information about existing biological resources.

"Before the impacts of a project can be assessed and mitigation measures considered, an EIR must describe the existing environment. It is only against this baseline that any significant environmental effects can be determined. (Guidelines, §§ 15125, 15126.2, subd. (a).)" (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952 (*Amador*).) Accordingly, the Guidelines provide that "an EIR must include a description of 'the physical environmental conditions in the vicinity of the project' which constitute the 'baseline physical conditions' for measuring environmental impacts. (Guidelines, § 15125, subd. (a).)" (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 658; see also *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 87.) However, "[t]he description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects." (Guidelines, § 15125, subd. (a).) We thus turn to the record to determine whether, as the trial court ruled, the description of baseline conditions in this case was inadequate because it failed to provide an accurate estimate of the population of fish larvae and other organisms inhabiting the source waters in the vicinity of the Project.

Preliminarily, the record reflects that the EIR's description of the environmental setting was not based solely on the two months of water sampling. The two-month study was conducted to measure the types of eggs and larvae—not juvenile and adult fish— present in the Bay at the time the risk of entrainment is highest. The EIR reflects that winter-run and spring-run chinook salmon, steelhead trout, and green sturgeon in the Project area are not present as eggs or larvae. To assess the types of juvenile and adult fish present in the Project area, the District used a year-long project-specific study and decades of CDFG data. Specifically, in the year-long study, the District "sample[d] various habitats, fish communities, and lifestages within the area immediately adjacent to

31

the proposed water intake and discharge location." The District relied on data gathered by CDFG during 1980-2001. The District also reviewed California Natural Diversity Database and USFWS's species lists for wildlife species and habitat within a ten-mile radius of the Project.

The EIR described the intake site as "a spawning habitat for fish and macroinvertabrates, a foraging and juvenile rearing area, and a migratory corridor for a variety of anadromous fish species including chinook salmon, steelhead, striped bass, sturgeon, and American shad." The EIR stated these species "spawn upstream in freshwater, and no larval forms of these species are expected to occur in this area of the Bay." The EIR noted that due to the size of adults and outmigrating young-of-the-year, Project operation will not significantly impact chinook salmon, steelhead, and green sturgeon using the Project area as a migration corridor and foraging habitat. The EIR described various aquatic habitat types located in the Project area, and organisms found in these habitats. The EIR acknowledged the Central San Francisco Bay was an Essential Fish Habitat. The EIR also stated the Bay-Delta was a critical habitat for winter-run chinook salmon. The EIR stated that a critical habitat for the southern distinct population segment of green sturgeon had not been designated at the time the District published the EIR. Appendix D to the EIR included "a list of [] special-status plant and wildlife species . . . [including] legal status, description of habitat preference, and the recorded or potential occurrence [of each species] in the project area." For special-status species potentially present, the EIR provided life-cycle information, including information for winter-run chinook salmon, spring-run chinook salmon, fall-run chinook salmon, steelhead, and green sturgeon. Finally, for fish entrained during the year-long study, Appendix C specified the results of the data collection efforts, including the minimum, maximum, and average lengths for all entrained larvae.

Having considered this record, we conclude that the EIR's description of the environmental setting was more than adequate.

3.      Pile Driving

Offshore construction related to the reconstruction of the Marin Rod & Gun Club pier would involve driving up to 175 concrete piles into the Bay.  As a result, the construction activity associated with the pile driving would result in increased underwater noise and acoustic pressure waves, which would affect aquatic resources "by causing behavioral avoidance of the construction area and/or sublethal or lethal effects on sensitive species."  To mitigate the potentially significant impact on such species, the EIR identified and the District adopted mitigation measure 4.3-9(a), which provided the following:  "NOAA Fisheries would be consulted regarding appropriate measures to mitigate potential effects on fish, including special-status species (chinook salmon, steelhead, and green sturgeon).  Such measures normally include specifying allowable seasonal work windows for in-water pile driving and use of physical attenuators such as air bubble curtains.  [¶] During initial pile-driving efforts, the area around the in-water pile-driving activities will be monitored for signs that fish are being injured (e.g., floating on the surface, or birds moving in to prey on dead or injured fish)."

The trial court ruled that the mitigation measures of monitoring and consulting with NOAA Fisheries were not sufficiently specific.  In so ruling, the court noted that although monitoring is a necessary measure, it found that the commitment to consult with NOAA Fisheries regarding potential mitigation measures, "impermissibly defers to the future the identification of specific mitigations [measures]" that will reduce sound pressure levels "to less than [significant]."  The trial court also faulted the EIR for failing to indicate "if NOAA Fisheries [had] permitting authority to compel compliance with its recommendations, or if the recommendations are voluntary."  On appeal, the District argues that the Alliance failed to exhaust its administrative remedies concerning the adequacy of mitigation measure 4.3-9(a) and, in any event, the measure complies with CEQA.

We have reviewed the comment letter from the Marin Audubon Society and conclude that the adequacy of mitigation measure 4.3-9(a) was raised, albeit briefly.  Specifically, in its letter the Marin Audubon Society expressed its "concern[] about the

33

impacts on fish of the driving so many piles. Mitigation measures should also include the use of blankets to muffle the noise . . . ." Nothing in this letter, however, suggested that the measures failed to comply with CEQA, or that consultation with the NOAA Fisheries constituted an improper deferral.[5]

Nevertheless, even assuming the Alliance exhausted it administrative remedies with respect to mitigation measure 4.3-9(a), this measure was adequate. In analyzing the impacts associated with the Project, including noise impacts on aquatic life, the EIR set forth various thresholds for determining whether the Project would have a significant impact on biological resources. These thresholds included whether pile-driving noise would (1) cause substantial adverse effects to sensitive species, (2) result in a "take" of listed, threatened, or endangered species, (3) interfere substantially with the movement of any fish, or (4) cause any fish population to drop below self-sustaining levels. Based on these standards, the EIR concluded implementation of Mitigation Measure 4.3-9(a) would reduce impacts to insignificant levels.

The EIR stated the District would obtain "Incidental Harassment Authorization" and "consult[] with . . . NOAA Fisheries in accordance with Section 7 of the Federal Endangered Species Act (ESA)." The District's Board reiterated these requirements. There was nothing improper about the requirement to consult with NOAA Fisheries. The Project requires a permit from the U.S. Army Corps of Engineers ("Corps") pursuant to

---

[5] The Alliance cites to several other comment letters, which it claims raise the issue of underwater noise impacts on aquatic species; they do not. For example, the Marin Conservation League comment referenced by the Alliance relates to Impact 4.9-3 and the Project's above-water noise impacts, not impact 4.3-9 or the adequacy of Mitigation Measure 4.3-9(a). The remaining comments cited by the Alliance do not address underwater sound and vibration generally or the adequacy of Mitigation Measure 4.3-9(a). (See letter from CDFG [commenting on entrainment]; letter from Bay Conservation & Dev. Comm. [discussing San Francisco Bay Plan policies]; letter from City of San Rafael [commenting on aesthetics]; letter from Tiburon Community Dev. Dept. [commenting on water tanks]; letter from Garril Page [commenting on energy and water quality]; letter from NOAA Fisheries [commenting on entrainment]; letter from Stephan C. Volker, Esq. [general comment on biological impacts].)

34

Section 404 of the Clean Water Act ("CWA"). CWA permitting under section 404 triggers consultation with NOAA Fisheries under Section 7 of the ESA. (See *Northern California River Watch v. Wilcox* (9th Cir. 2011) 633 F.3d 766, 774.) ["when a private party [] applies for a permit under § 401 and § 404 of the CWA, the Corps must confer with the FWS [and NOAA Fisheries]"]; *Defenders of Wildlife v. Bernal* (9th Cir. 2000) 204 F.3d 920, 924 ["Because a federal [CWA] permit was at issue, the FWS informed the Corps that 'formal consultation' pursuant to Section 7 of the ESA was required"].) The EIR and the administrative record repeatedly acknowledge the "consultation [requirement] with the . . . USFWS and NOAA Fisheries in accordance with Section 7 of the . . . ESA."

The Alliance, citing *EHL, supra,* 131 Cal.App.4th at p. 794, argues that even if the District will undertake Section 7 consultation, this commitment is "too vague to apprise the public of the specific mitigation measures to be utilized." *EHL,* however, is inapposite. In *EHL*, the court rejected a mitigation measure because it merely required a private developer to prepare "an acoustical analysis" in the future, and then comply with the analysis' recommendations. There, the acoustical analysis was neither subject to agency oversight nor required as part of an established state or federal regulatory program. (*EHL, supra,* 131 Cal.App.4th at p. 794.)

Here, by contrast, the commitment to undertake consultation with NOAA Fisheries does not impermissibly defer to the future the identification measures. Consultations with NOAA Fisheries *must* occur, both as part of the federal permitting process under the CWA and ESA, and under the express terms of the mitigation measure. Such mitigation is adequate under CEQA. (See *SOCA, supra,* 229 Cal.App.3d at p. 1028 [upholding mitigation requiring development of "a transportation management plan, a plan the City itself, not the developer, will prepare"]; *CNPS v. Rancho Cordova, supra,* 172 Cal.App.4th at p.621 ["the details of exactly how mitigation will be achieved under the identified measures can be deferred pending completion of a future study"].) As the Courts have observed, " '[a] condition requiring compliance with environmental

35

regulations is a common and reasonable mitigating measure. [Citation].' " (*Clover Valley, supra,* 197 Cal.App.4th at p. 236.)

For example, in *Clover Valley, supra,* 197 Cal.App.4th 200, an EIR mitigated potential impacts to protected bird species by requiring compliance with regulatory permitting. Petitioner argued the mitigation measure "wrongfully [deferred] mitigation . . . ." (*Id.* at p. 233.) The court disagreed, reasoning that "deferring the formulation of the details of a mitigation measure [is authorized] where another regulatory agency will issue a permit for the project and is expected to impose mitigation requirements independent of the CEQA process so long as the EIR included performance criteria and the lead agency committed itself to mitigation." (*Id.* at p. 237.)

Here, the EIR complied with CEQA requirements. The EIR identifies the thresholds used to determine if pile-driving impacts on fish will be significant. These standards included whether pile-driving would "[r]esult in the 'take' (defined as kill, harm, or harass) of any listed threatened or endangered species or the habitat of such species" or "cause a fish or wildlife population to drop below self-sustaining levels . . . ." Additionally, the EIR sets forth the sound level that must not be exceeded ("180 dB (peak) is generally the threshold that NOAA Fisheries recognizes as a level that can cause physical harm to fish"). Mitigation Measure 4.3-9(a) identifies measures normally used to reduce the noise impact below this level, and requires the District to consult with NOAA Fisheries to identify the steps needed to meet this standard.

In sum, consultation under Section 7 of the ESA, coupled with the commitment to avoid the take of protected species, constitutes adequate mitigation under CEQA.

G.     *The EIR's Analysis of the Project's Energy Impacts*

The trial court ruled that the EIR failed to adequately discuss a particular alternative—the use of green energy credits to mitigate the energy impacts of the Project.

A compliant EIR considers a "range of reasonable alternatives" to a proposed project to "foster informed decisionmaking and public participation." (Guidelines § 15126.6, subd. (a).) Here, the EIR referenced that the District conducted an alternative energy survey, reviewing six alternative energy scenarios for powering the Project.

36

These scenarios included reconductoring of the existing power lines and purchasing green energy credits. The EIR noted that the "purchase of green energy [credits] has a distinct environmental benefit" in reducing greenhouse gas (GHG) emissions and air pollutants. However, the EIR concluded: "GHG reductions have global benefits in reducing potential impacts to global warming, and the location of the potential GHG reductions is [ ] not particularly relevant. The reductions in local/regional criteria air pollutant emissions that accrue from support of green energy would accrue to the location where the renewable energy is generated and would not provide a direct benefit in the airshed shared by [the District's] customers." In the end, the EIR incorporated the alternative of reconductoring the existing power lines as part of the proposed Project, noting as follows: "The purchase of green energy credits can be pursued by [the District] either directly or by creating a self-funded green-E account by offering customers the ability to select green-E on their water bill for a voluntary surcharge. Purchasing green energy credits would still require reconductoring the existing . . . transmission lines because the existing lines do not provide sufficient voltage to power the proposed desalination facility."

The EIR, however, concluded that since "the proposed project represents an appropriate use of energy and has been designed to use that energy efficiently[,] . . . the [energy] impact is less than significant . . . ."

"An EIR need not consider every conceivable alternative to a project." (CEQA Guidelines, § 15126.6, subd. (a).) Moreover, "alternatives shall be limited to ones that would avoid or substantially lessen any of the *significant effects of the project.*" (CEQA Guidelines, § 15126.6, subd. (f), italics added, see also §§ 21002, 21002.1, subd. (b), 21081, subd. (a) [discussing mitigation of "significant" impacts].) In *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 928, for example, the EIR only identified air quality and traffic as potential significant impacts and did not consider the alternative of a reduced-size project. Nor did it need to, said the appellate court, because a reduced-size alternative would not have addressed air quality and traffic, but only other impacts such as store closures and energy consumption, which were not identified as significant

37

environmental impacts of the project.  (*Tracy First,* at pp. 928-929.)  Similarly, in *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 564, an EIR only identified potential significant impacts due to oil spills, but not due to impediment of recreation.  The plaintiffs argued the EIR should have considered the alternative of burying a pipeline between a terminal and an oil refinery as a means of opening the shoreline for recreational uses.  (*Ibid.*)  The appellate court rejected this argument, ruling that the EIR did not need to include the pipeline alternative, since it was directed at an asserted impact not identified in the EIR.  (*Ibid.*)  For this reason, there was no significant impact on recreational uses.  (*Ibid.*)

The same analysis applies here.  The final EIR concluded the Project's energy impacts would be insignificant—a conclusion the trial court found to be supported by substantial evidence.  Accordingly, the EIR did not need to discuss further green energy credits as an alternative mitigation measure for the energy impacts of the Project.

*H.      The EIR's Analysis of Project's Cumulative Greenhouse Gas Impacts*

The trial court rejected the Alliance's argument that the EIR contained an inadequate analysis of the Project's potential cumulative impact analysis on gas GHG emissions.  In so ruling, the trial court explained that the Alliance "fail[ed] to identify how the . . . cumulative impact analysis was deficient. [The Alliance] do[es] not identify any other related past, present, or possible future Project, that, when combined with the effects of this Project, creates a significant cumulative impact."  Despite this ruling, the trial court, nevertheless, concluded that the EIR did not contain substantial evidence to support the conclusion that the Project's GHG emission are not cumulatively considerable.

When analyzing potentially cumulative GHG emission impacts, lead agencies should "make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of [GHG] emissions resulting from a project."  (Guidelines, § 15064.4, subd. (a).)  In assessing the significance of these emissions, the lead agency should consider the extent to which the project may affect emissions levels; whether emissions exceed an applicable threshold of significance; and

38

whether the project complies with regulations or requirements adopted to implement statewide, regional, or local plans to reduce GHG's. (*Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 335-336, citing Guidelines, § 15064.4, subd. (b).) An EIR is required to "consider feasible means, supported by substantial evidence and subject to monitoring or reporting, of mitigating the significant effects of [GHG] emissions." (Guidelines, § 15126.4, subd. (c).)

Here, the EIR stated, "Recent scientific evidence strongly suggests that there is a connection between climate change (or global warming) and emissions of greenhouse gases (GHGs)." Prominent GHGs include carbon dioxide methane (CH45, nitrous oxides, water vapor, which are emitted by both natural and human-made sources. The EIR acknowledged that "the increase in human-made GHGs over the past several decades has caused global atmospheric temperatures to rise above historic levels. The sources of human-made GHGs that are of the greatest concern include power plants, industry, agriculture, home heating, open burning, motor vehicles, and other transportation modes that use fossil fuels (i.e., ships, trains, aircraft, and construction vehicles)." The EIR reported that Assembly Bill No. 32, enacted in 2006,"called for the [California Air Resource Board (CARB)] to adopt regulations that would require the reporting and verification of statewide GHG emissions and limit statewide GHG emissions to 1990 levels by 2020." According to the EIR, no CEQA thresholds of significance have been established for GHGs. The EIR noted, however, that in 2005, "the BAAQMD began a Climate Protection Program with several aims, including assembling a stationary source inventory of GHGs in the Bay Area, a study of GHG control technology, integration of climate change issues into other BAAQMD programs, and active support of climate change programs around the Bay Area." The EIR reported that "the BAAQMD is not currently proposing any regulations," but noted that "its history of leadership suggests that it would be actively involved in any climate change programs or regulations that take effect in the Bay Area." Further, the EIR noted that "in 2002, Marin County officially joined the Cities for Climate Protection, a campaign that requires the county to determine a baseline emissions rate, set a reduction rate, and adopt an action plan for achieving

these reductions. An interim plan of voluntary 15 to 20 percent reductions from the 2000 level was adopted, with the ultimate goal of 15 percent reductions from the 1990 level. Proposed reduction measures are categorized by energy use, transportation, waste management, and land use, with energy use measures focused on energy efficiency and green power generation." The EIR further noted that the District "has joined as a partner in this program and has committed to reduce its GHG emissions to 15 percent below 1990 levels by 2020."

Based on Assembly Bill No. 32 and the District's own more aggressive goal to reduce GHG emissions, the threshold used in the EIR was whether the Project would interfere with the County's goal of reducing GHG emissions to 15 percent below the 1990 levels by 2020. According to the EIR, "GHGs from the proposed desalination project would be primarily associated with energy consumption for plant operations." The EIR explained that, "[c]urrently, there does not appear to be consensus in the scientific community as to when and under what circumstances a project's incremental contribution to the global problem of climate change would be considered 'cumulatively considerable.' " As such, "in light of the emission reductions goals of Assembly Bill No. 32, it can be argued that implementation of this project may result in a cumulatively considerable contribution to the global problem."

The EIR explained that the Project "would directly generate minimal GHG emissions. Those emissions would consist of vehicle exhaust generated by the facility's small workforce. The project would indirectly generate a larger volume of GHG emissions associated with the generation of electricity used by the plant." The EIR further explained, "[a]lmost all of [the District's] emissions come from the electricity purchased by [the District] from [Pacific Gas & Electric] [(]PG&E[)]. That is, [the District's] GHG emissions are indirect; GHGs are emitted by PG&E in the course of generating electricity that is subsequently used by [the District]." As noted in the EIR, the same would also be true for Project-related GHG emissions. To reduce these emissions, the design "incorporate[s] high-efficiency pumps and the most advanced energy recovery systems available. The facility's system operations would also be

40

designed to minimize energy use depending on the salinity and temperature of the Bay water."

The EIR established PG&E's existing production level was sufficient to provide energy required by the Project under all operating scenarios (at peak operations Project "would consume less than 1 percent of the electricity available to PG&E customers in 2005 that was not purchased by those customers"). Thus, according to the EIR "it is unlikely that operation of the desalination plant at any capacity would result in increased production at any of the fossil-fueled power plants that serve the electrical grid for Northern California." Based on this evidence, the EIR concluded the Project's energy demand "would not result in an indirect increase in pollutant emissions."

Nevertheless, the EIR went one step further, in that it also assumed the Project would trigger the need for generating additional electricity, and that this additional electricity would be generated at fossil-fueled power plants. The EIR estimated electricity generation for the Project would generate between 4,000 tons/year (for 5 MGD plant under average operating conditions) to 30,000 tons/year (for 15 MGD plant under drought conditions) of GHG emissions.

The EIR then compared these emissions to worldwide, nationwide, statewide, countywide, and existing District emissions, and to per-capita emissions within Marin County. The EIR also summarized countywide GHG emissions by sector. Based on this information, the EIR concluded the Project would not interfere with achieving a 15 percent reduction in countywide GHG emissions, compared to 1990 levels, by 2020. This analysis more than satisfied the requirements of CEQA. (*Santa Clarita Organization for Planning the Environment v. City of Santa Clarita* (2011) 197 Cal.App.4th 1042*,* 1056 [upholding climate change analysis because the EIR disclosed " 'the analytic route the . . . agency traveled from evidence to action' "].)

Additionally, in approving the Project, the District's Board adopted a policy requiring offsets for all Project-related GHG emissions. Abundant evidence reaffirms this commitment. During the administrative process, no one questioned this goal or its feasibility.

41

Although the Alliance disagreed with the District's significance conclusion, mere disagreement is insufficient. (*CNPS v. Rancho Cordova, supra,* 172 Cal.App.4th at p. 626; *Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 944-945 [" 'the reviewing court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable, "for, on factual questions, [the court's] task" is not to weigh conflicting evidence and determine who has the better argument' ' "]; *Ballona Wetlands, supra,* 201 Cal.App.4th at pp. 475-476 [disagreement over climate change responses did "not render the responses inadequate"].) The above facts and analysis constitute substantial evidence to support the conclusion that the Project would not result in a cumulatively considerable GHG emission impact. (*Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1, 13 [" ' "burden is on the [petitioner] to show there is no substantial evidence whatsoever to support the findings of the agency" ' "].)

We discern no inconsistency in the EIR because it mentioned that, in light of the absence of a specific threshold, together with the goals of Assembly Bill No. 32, " 'it can be argued that the implementation of this Project may result in a cumulatively considerable contribution to the global [GHG] problem.' " Rather, the EIR merely disclosed the disagreement regarding the current approach to determining whether GHG emissions are cumulatively considerable. This disclosure was proper; CEQA provides EIRs should summarize points of disagreement. (Guidelines, § 15151.) More importantly, the EIR analyzed and unambiguously concluded the Project would not interfere with achieving the 15 percent GHG reduction goal by 2020.

Finally, we reject Alliance's argument that District's policy commitment to purchase only renewable energy sources was vague and unenforceable. First, the District did not make this commitment to *mitigate* a Project impact; for this reason, cases involving deferral of CEQA mitigation (e.g., *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 93), are inapposite. (*East Shore Parks, supra,* 202 Cal.App.4th at p. 564 [duty to mitigate does not arise when project does not cause significant impact].) Second, even if this commitment constituted a mitigation

measure, the trial court's dismissal of the commitment was inappropriate. The Board decided, as a matter of policy, to go forward with the Project only if electricity could be supplied from renewable sources. The Board did so knowing it would have to adhere to that commitment. (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 449-450 [adopted mitigation is binding agency obligation].) The record contained substantial evidence showing the feasibility of adhering to this commitment.

## I.     *Recirculation*

In response to comments, the FEIR added Alternative 8, also known as "Sonoma-Marin Transmission Line with Conservation," which proposed the construction of a pipeline to deliver water from the Russian River to the District, along with added conservation measures. The trial court, after apparently conducting its own water supply calculation and analysis, determined that Alternative 8 represented a "significant new feasible solution to the project objectives," and it required recirculation.

"[T]he essential purpose of the EIR is to inform the public and its responsible officials of the environmental consequences of their decisions before they are made. [Citation.]" (*Marin Mun. Water Dist. v. KG Land California Corp., supra,* 235 Cal.App.3d at p. 1666.) "Once a draft EIR has been circulated for public review, CEQA does not require any additional public review of the document before the lead agency may certify the EIR except in circumstances requiring recirculation. A lead agency must recirculate an EIR when 'significant new information' is added to an EIR after the draft EIR has been circulated for public review. (. . .§ 21092.1; Guidelines, § 15088.5, subd. (a).) New information added to an EIR is not 'significant' unless 'the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement.' (Guidelines, § 15088.5, subd. (a).)" (*Clover Valley, supra,* 197 Cal.App.4th at p. 223.)

" 'Significant new information' includes, for example, a disclosure that: (1) a new significant environmental impact would result from the project or a new mitigation

43

measure; (2) a substantial increase in the severity of an environmental impact would result unless mitigation measures are adopted; (3) a feasible alternative or mitigation measure considerably different from others previously analyzed would clearly lessen the project's significant impacts but the project's proponents decline to adopt it; or (4) the draft EIR 'was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded. [Citation.]' (Guidelines, § 15088.5, subd. (a).)" (*Clover Valley supra,* 197 Cal.App.4th at p. 223.) This guideline, however, was "not intend[ed] to promote endless rounds of revision and recirculation of EIR's." (*Laurel Heights Improvement Assn. v. Regents of the University of California* (1993) 6 Cal.4th 1112, 1132 (*Laurel Heights II*).) Rather, recirculation is "an exception, rather than the general rule." (*Ibid.*)

"Recirculation is not required where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR." (Guidelines, § 15088.5, subd. (b).) An agency's decision not to recirculate the draft EIR is entitled to substantial deference; the petitioner bears the burden of proof to show no substantial evidence supports the agency's decision. (Guidelines, § 15088.5, subd. (e); *Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 904-905 [no recirculation required despite changes in project phasing]; *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 266-268 [seismic studies and requests for further investigation by regulators did not trigger duty to recirculate DEIR absent evidence of new seismic risks]; *Clover Valley, supra,* 197 Cal.App.4th at p. 223 [information in FEIR provided further details but did not identify new impacts; recirculation not required].)

In the present case, the District concluded the information added in Alternative 8 did not constitute "significant" information and it did not recirculate the EIR. As did the trial court, we apply the substantial evidence test to the District's determination. (*Laurel Heights II, supra,* 6 Cal.4th at p. 1135.) However, unlike the trial court, we conclude that substantial evidence supported the determination not to recirculate the EIR.

44

Alternative 8 is neither a considerably different nor a feasible alternative. Alternative 8 combines construction of a pipeline to deliver Russian River water to the District, along with conservation measures. The DEIR considered a conservation alternative (Alternative 2), but concluded that "reliance on conservation measures alone would not balance the available water supply with the demand of [the District's] customers, even assuming implementation of 25 percent mandatory rationing measures in a drought similar to that of 1976-77." The DEIR also considered "piping excess flood waters from [the] Russian River . . . ." The DEIR concluded this alternative was not feasible because, among other reasons, when the Russian River is experiencing flood conditions, the District's "reservoirs would also be full and spilling, leaving no place to store the water." As such, the District would have to increase its existing reservoir capacity, which it explained was not a viable option.

Further, substantial evidence supports the District's conclusion that Alternative 8 is infeasible. CEQA defines "feasible" as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, §15364.) Here, the trial court's calculations were premised on continued delivery of 7,700 acre-feet-per-year of Russian River water from Sonoma County Water Agency (SCWA). Record evidence, however, cast doubt on the continued availability of this amount of water. That evidence included existing limitations in SCWA's infrastructure capacity, and a Biological Opinion issued by NOAA Fisheries requiring SCWA to reduce diversions from the Russian River. According to the Biological Opinion, "[t]here is significant uncertainty regarding the extent to which SCWA [may] have to reduce its deliveries to its contractors, as well as how those deliveries would be allocated among SCWA's contractors." Indeed, a consultant hired by the Alliance conceded that "there's a lot of issues with bringing in more Russian River water." Thus, deliveries from SCWA, even during normal years, remain deeply uncertain.

Even disregarding these uncertainties, Alternative 8 would only meet the District's supply needs in non-drought years. The EIR concluded Alternative 8 "would not be

45

sufficient to ensure that supply meets [the District's] drought-year demand . . . ." The Project objectives "are to provide high-quality, reliable potable water to help balance water supply and demand in [the District's] service area, including during emergencies and drought conditions . . . ." Alternative 8 would not meet this basic objective.

The District also concluded "diversifying its water supply portfolio is critical to ensuring the availability of high-quality, reliable potable water to help balance water supply and demand in [the District's] service area, including during emergencies and drought conditions." The District relies on the Russian River for approximately 26 percent of its water supply. Further reliance on "uncertain water deliveries from the Russian River" would not diversify the District's water portfolio.

In sum, the record reflects that there are substantial doubts whether developing a Russian River pipeline would reliably provide additional water supplies to the District, especially during emergencies and drought conditions. As substantial evidence supported the finding that Alternative 8 was not a feasible alternative, its inclusion in the FEIR did not trigger recirculation.

### III. DISPOSITION

The judgment is reversed. The trial court is instructed to enter, consistent with this opinion, a new and different judgment denying the petition for writ of mandate. The District is entitled to recover its costs on appeal.

_____
REARDON, J.

We concur:


_____
RUVOLO, P.J.


_____
RIVERA, J.

46

Trial Court:                    Marin County Superior Court


Trial Judge:                    Hon. M. Lynn Duryee


Counsel for Appellant:          Remy Moose Manley, LLP
                                Whitman F. Manley

                                Mary R. Casey
                                Marin Municipal Water District

                                Thomas Law Group
                                Tina Thomas
                                Christopher J. Butcher



Counsel for Respondents:        Law Offices of Stephan C. Volker
                                Stephan C. Volker
                                Stephanie L. Abrahams
                                Daniel P. Garrett-Steinman
                                Jamey M. B. Volker