Filed 12/2/14; pub. order 12/30/14 (see end. of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al., <br><br>      Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al., <br><br>      Defendants and Respondents; <br><br> NORTH GUALALA WATER COMPANY et al. <br><br>      Real Parties in Interest and Respondents. | A138914 <br><br> (Mendocino County Super. Ct. No. SCUK-CVG-10-55593) |

The California Department of Forestry and Fire Protection (CAL FIRE) approved a "Nonindustrial Timber Management Plan" (NTMP) authorizing logging on approximately 615 privately held acres of north coast redwood and Douglas fir forest located in Mendocino County.  Appellants Center for Biological Diversity, Friends of the Gualala River, and Coast Action Network (collectively Petitioners) initiated administrative mandamus proceedings (Code Civ. Proc., § 1094.5) seeking to set aside CAL FIRE's approval of the NTMP, alleging violations of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] and the California

_____

[1] Undesignated statutory references are to the Public Resources Code.

1

Endangered Species Act (CESA; Fish & G. Code, § 2050 et seq.). Petitioners also sought a writ of mandate (Code Civ. Proc., § 1085) and declaratory relief against the California Department of Fish and Wildlife (DFW),[2] alleging that DFW failed to fulfill its public trust and statutory obligations by failing to object to the NTMP. The trial court denied relief. We affirm.

## I. BACKGROUND

### *The Forest Practice Act*

Timberland use in California is governed in significant part by the Z'berg-Nejedly Forest Practice Act of 1973 (§ 4511 et seq.; hereafter Forest Practice Act) and the Forest Practice Rules promulgated by the State Board of Forestry (Cal. Code Regs., tit. 14, § 895 et seq.).[3] The purpose of the Forest Practice Act is to regulate the use of timberlands to ensure their productivity while also "giving consideration to values relating to sequestration of carbon dioxide, recreation, watershed, wildlife, range and forage, fisheries, regional economic vitality, employment, and aesthetic enjoyment." (§ 4513; see also § 4514, subd. (c).) These purposes are accomplished in part by management of nonindustrial timberlands. (§§ 4593–4594.7.)

An NTMP, as provided in the Forest Practice Act, is a long-term plan for sustained yield timber production which may be utilized by owners of less than 2500 acres of timberland who are not primarily engaged in the manufacture of forest products. (§ 4593.2.) The plan must be prepared by a registered professional forester (forester).[4] (§ 4593.3; FP Rules, rule 895.1.) "[CAL FIRE] is the public agency initially charged

---

[2] Formerly the Department of Fish and Game (Fish & G. Code, § 700).

[3] Rule references cited as the Forest Practice Rules in text and as FP Rules parenthetically are to title 14 of the California Code of Regulations.

[4] A "professional forester," is "a person who, by reason of his or her knowledge of the natural sciences, mathematics, and the principles of forestry, acquired by forestry education and experience, performs services, including, but not limited to, consultation, investigation, evaluation, planning, or responsible supervision of forestry activities when those professional services require the application of forestry principles and techniques." (§ 752, subd. (a).)

with the duty of determining whether or not a proposed timber harvesting plan incorporates feasible silvicultural systems,[5] operating methods, and procedures to substantially lessen significant adverse impacts on the environment.  ([FP Rules, rule 898.1(c)(1)].)" (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1228 (*Sierra Club*).)  CAL FIRE serves as the "lead agency" in conduct of environmental reviews for such projects.  (FP Rules, rule 1037.5(c).)  The Forest Practice Rules require CAL FIRE to establish interdisciplinary review teams to review plans and assist it in "the evaluation of proposed timber operations and their impacts on the environment."  (*Id.*, rule 1037.5)  A DFW representative is to be included "when possible."[6] (*Id.,* rule 1037.5(a).)  DFW and other members of the review team serve in an "advisory capacity" and "assist the Director" in determining if plans conform to the Forest Practice Act and Forest Practice Rules.  (*Id.*, rule 1037.5(b).)

CAL FIRE's approval of timber operations is generally subject to CEQA, but the Forest Practice Act's regulatory scheme has been certified for exemption from CEQA's requirements for preparation of an environmental impact report (EIR) before approval of a project.  (§ 21080.5; *Sierra Club, supra,* 7 Cal.4th at p. 1230.)  The Forest Practice Act and Forest Practice Rules together constitute a certified regulatory program under CEQA.  (*Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 611.)  An NTMP "functions as the equivalent of an EIR." (*Sierra Club,* at p. 1230.)  "[A]s the functional equivalent of an EIR, a timber harvest plan must 'provide public and governmental decisionmakers with detailed information on the project's likely effect on the environment, describe ways of minimizing any significant impacts, point out mitigation measures, and identify any alternatives that are less environmentally

---

[5] " 'Silviculture' is the theory and practice of controlling the establishment, composition and growth of forests."  (FP Rules, rule 895.1.)

[6] DFW, as trustee for state fish and wildlife resources, is also charged by statute with consulting with lead and responsible agencies on CEQA projects and providing its biological expertise in reviewing and commenting upon environmental documents and impacts arising from project activities.  (Fish & G. Code, § 1802.)

3

destructive.' [Citation.]" (*Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection* (2008) 43 Cal.4th 936, 943.)

*The Bower NTMP and Unit 9 Parcel*

On October 29, 2008, real parties in interest John and Margaret Bower, Bower Limited Partnership, and North Gualala Water Company (collectively Bower) submitted a proposed NTMP to CAL FIRE, seeking authorization for timber harvesting activities in an area of approximately 615 acres located adjacent to and to the north and northeast of the town of Gualala. The plan was divided into 10 harvest units, across four CAL FIRE planning watersheds (Roseman Creek, Big Pepperwood Creek, Doty Creek, and Robinson Creek).[7] Forest stands in the NTMP units generally range from young trees to second and third growth redwood and Douglas fir forests, with scattered late seral[8] "residual" components.

At issue here is CAL FIRE's approval of (and DFW's nonobjection to) logging activity on an approximately 17-acre section of "Unit 9," located in the Doty Creek Watershed.[9] Unit 9 covers approximately 84 acres in total, composed primarily of second growth redwood and Douglas fir. The portion of Unit 9 that is the focus of this litigation was identified by DFW as "a stand embedded in Unit 9 that meets the structural definition of Late Succession Forest Stands as defined in the [Forest Practice Rules, rule 895.1]."[10] We refer to this stand, as have the parties, as the LSFS.

---

[7] The NTMP "Management Unit Description" section also identifies a "Unit 11" to be used for "forest health, powerline corridor, fuel hazard reduction and limited timber production."

[8] As described by DFW, late seral (i.e., old or mature) forest habitats "emerge over time from the general accumulation of growth, small disturbances, natural tree mortality and colonizing species . . . produc[ing] structural complexity . . . ."

[9] DFW estimated the disputed portion of Unit 9 to be approximately 18 acres.

[10] " 'Late succession forest stands' means stands of dominant and predominant trees that meet the criteria of [California Wildlife Habitat Relationships] class 5M, 5D, or 6 with an open, moderate or dense canopy closure classification, often with multiple canopy layers, and are at least 20 acres in size. Functional characteristics of late succession forests include large decadent trees, snags, and large down logs." (FP Rules,

4

*The Marbled Murrelet*

It appears largely undisputed that the LSFS in its present condition is potentially a "functional nesting habitat"[11] for the marbled murrelet, a small seabird which is federally listed as a threatened species and classified under CESA as an endangered species. The murrelet is found off California coastal waters from Del Norte to Santa Cruz Counties "in marine and pelagic habitats and nests in coastal coniferous forests," and requires "dense old growth or mature forests of redwood and Douglas-fir" and "[l]arge diameter, moss covered or mistletoe branches that create a broad flat surface (referred to as a platform)" for nesting and breeding. It also appears undisputed that murrelets have no known history of actually nesting in the LSFS. As discussed *post*, the parties take very different views as to the NTMP's impact on the functionality of the murrelet habitat and on murrelet populations generally.

---

rule 895.1.) DFW, and Petitioners, generally use the phrase "late seral forest" as a descriptor for this parcel. This is not a defined term under the Forest Practice Act or Forest Practice Rules, and the parcel does not meet the definition of "late succession forest stands," which applies only to stands "at least 20 acres in size." (*Ibid.*) DFW considered its own "late seral" definition "more ecological." Bower and his forester disputed the "late seral" characterization of the LSFS, but the NTMP nevertheless treats the LSFS as if it were a late succession forest stand.

[11] " 'Functional Nesting Habitat' means habitat with a dominant and codominant tree canopy closure of at least 40% and a total canopy (including dominant, codominant, and intermediates) of at least 60%. Usually the stand is distinctly multi-layered with an average stem diameter in dominant, codominant conifers, and hardwoods > 11[-inch diameter at breast height]. The stand usually consists of multi-specied trees (including hardwoods) of mixed sizes. All nests, snags, down logs, and decadent trees shall also be considered as part of the habitat. Nesting substrates are provided by broken tops, cavities, or platforms such as those created by a hawk or squirrel nest, mistletoe broom, or accumulated debris. Owls are known to occasionally nest in less than optimal habitat. Nesting areas may also be associated with topographical relief and aspect which alter microclimates." (FP Rules, rule 895.1.)

5

*Procedural History*

The Bower NTMP was resubmitted to CAL FIRE in late October 2008.[12] CAL FIRE, DFW and other agency personnel attended a preharvest inspection of Bower's property in December 2008. During that inspection, a DFW biologist characterized certain areas in Unit 9 as "emerging" late seral forest and suggested that the area might need to be evaluated for murrelet habitat. A preharvest inspection report, discussing Unit 9 and murrelet habitat, was filed by CAL FIRE on December 19, 2008. DFW recommended a murrelet consultation and requested that the perimeter of the late seral area in Unit 9 be walked and estimated. Bower's forester subsequently inventoried and photographed all large trees in the area. A second preharvest inspection was conducted by CAL FIRE, DFW, Bower and Bower's forester in February 2009, focusing on the large tree area. The inspection and consultation included an assessment of "several residual old growth redwood trees and one residual old growth Douglas-fir" and assessment of murrelet habitat. DFW submitted its preharvest inspection and murrelet consultation reports in June 2009. The consultation report opined that suitable murrelet habitat existed within the LSFS and proposed specific mitigation measures to avoid "take" of murrelets pending completion of protocol surveys within the LSFS.[13]

Bower's forester submitted a response to the DFW murrelet consultation report on August 5, 2009—identifying and mapping a total of 67 trees meeting the DFW definition and description of late seral habitat, ranging from 25 to 106 inches DBH.[14] A majority of the 67 trees are located within a 13-acre core area of the LSFS. Bower's forester characterized only seven as late seral and asserted that the LSFS had only "marginal potential for marbled murrelet occupation," given the parcel's small size and close proximity to a local airport and a residential area. DFW recommended retention of

---

[12] The plan was originally submitted on April l8, 2008, but returned for noncompliance with provisions of the Forest Practice Rules.

[13] Protocol surveys were conducted in 2010 and 2011.

[14] DBH is "diameter at breast height," and is a standard measurement for tree size. (See FP Rules, rule 895.)

39 large diameter trees (≥ 40-inch DBH) identified in and around the LSFS. A revised NTMP submitted in November 2009, required retention of 30 out of the 67 large diameter trees to provide structural characteristics beneficial to wildlife, with seven of these being adjacent to, but outside the boundaries of the LSFS.[15]

On December 3, 2009, the CAL FIRE review team chair recommended approval of the revised NTMP, subject to compliance with additional mitigation measures which were incorporated into the NTMP. These measures included replacement of fallen or dead wildlife trees, in a two for one ratio, with other trees selected for their wildlife value; prohibition of all group selection harvesting within the LSFS and within a 100-foot buffer zone around the LSFS; retention of two additional trees per acre with minimum of 24 inches DBH throughout Unit 9; and imposition of a three-year harvest moratorium within LSFS Area, to allow DFW to attempt acquisition of a conservation easement on the LSFS.

After close of the public comment period,[16] CAL FIRE issued its "Official Response" to public comments and approved the NTMP on December 31, 2009, concluding that large wildlife trees were being preserved, and "species largely dependent on late seral habitat features [would] not be adversely impacted." DFW did not submit a nonconcurrence. (See FP Rules, rule 1037.5(e) ["[i]f a member of the review team does not concur with the chairperson's recommendation to the Director, the member shall submit in writing, within 5 days of the review team meeting and before the action required by [rule] 1037.4, the specific reasons why the recommendation does not provide adequate protection of the resources for which his or her agency has responsibility"].)

---

[15] Seven of the trees identified for retention are potentially subject to later harvest if a qualified wildlife biologist certifies, in a written amendment to the NTMP, that one or more of these trees does not provide significant functional wildlife habitat, in the aggregate with habitat opportunities provided by other permanently retained trees and the managed stand structure.

[16] On November 16, 2009, CAL FIRE extended the public comment period for 30 days.

*The Litigation*

On February 5, 2010, Petitioners filed their "Verified Petition for Writ of Mandate, Complaint for Declaratory Relief for Breach of Public Trust, and Request for Injunctive Relief" (Petition). The Petition sought orders requiring CAL FIRE to set aside approval of the NTMP, a declaration that DFW was in violation of its statutory and public trust obligations, and an injunction prohibiting timber harvesting pursuant to the NTMP. The matter was tried to the court on May 14, 2013.[17] The court issued a statement of decision on May 24, 2013, denying the Petition in its entirety.[18] A notice of appeal was filed on June 10, 2013. Judgment was entered on June 19, 2013. On July 2, 2013, we granted Petitioners' request for a writ of supersedeas to stay logging activities within the LSFS pending resolution of this appeal.

## II. DISCUSSION

Petitioners contend that CAL FIRE, in approving the NTMP, failed to comply with the requirements of CEQA and the Forest Practice Rules. They insist that cumulative impacts of proposed logging in the NTMP will eliminate over 90 percent of the large trees in the LSFS, significantly reducing the overhead canopy, and rendering the stand unsuitable for murrelet nesting. They argue that approval of the NTMP also violates CESA by authorizing logging that would adversely modify late seral nesting habitat essential for survival and recovery of the murrelet. Finally, they contend that DFW violated its public trust obligations by failing to oppose the NTMP.

A. *CAL FIRE's Approval of the NTMP*

1. *Standard of Review*

CAL FIRE's approval of timber operations is subject to CEQA's standard of judicial review. (§§ 21168, 21168.5; *Sierra Club, supra,* 7 Cal.4th at pp. 1235–1236.) "In reviewing an agency's compliance with CEQA in the course of its legislative or

---

[17] The parties represent that they stipulated to stay the litigation for some period to permit settlement discussions.

[18] Although labeled a "Tentative Decision," the parties agree that the decision was intended to be the final order of the court.

8

quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427, fns. omitted (*Vineyard*).) " 'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.' " (*Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection, supra,* 43 Cal.4th at p. 944.)

Under CEQA, "substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1).) "Substantial evidence is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citations.]" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391.) A reviewing court "shall not exercise its independent judgment on the evidence but shall only determine whether the [agency's] act or decision is supported by substantial evidence in light of the whole record." (§ 21168.)[19] In determining whether an agency has prejudicially abused its discretion, " 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [agency's decision].' " (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 571.) Our review for substantial evidence applies a deferential standard that is satisfied if "the record contains

---

[19] Petitioners frequently cite to a different administrative record compiled by the DFW. The trial court sustained objections to this evidence. We do not consider extra-record evidence. (See *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576.)

9

relevant information that a reasonable mind might accept as sufficient to support the conclusion reached." (*Great Oaks Water Co. v. Santa Clara Valley Water Dist*. (2009) 170 Cal.App.4th 956, 968.)  The administrative determinations are presumed correct and we indulge all reasonable inferences from the evidence supporting those determinations. If more than one inference can be drawn from the evidence, " 'a reviewing court is without power to substitute its deductions' " for those of the agency.  (*Western States Petroleum Assn.,* at p. 571.)  "In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's [decision] on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' [Citation.]" (*Vineyard, supra,* 40 Cal.4th at p. 435.)

Our task is essentially identical to that of the trial court.  (*American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1070.)  Accordingly, "we review the agency's actions directly and are not bound by the trial court's conclusions.  [Citations.]" (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816–817.)  In that sense appellate judicial review under CEQA is de novo (*Vineyard, supra,* 40 Cal.4th at p. 427), and the burden on appeal to establish error is the same as the burden in the trial court, i.e., on the parties who challenge the administrative decisions (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 674).

2.      *Sufficiency of the NTMP*

Petitioners present several challenges to the sufficiency of the NTMP as an informational document.  Petitioners first contend that the NTMP failed to adequately assess cumulative impacts of logging in the LSFS, and that approval of the plan under such circumstances resulted in CAL FIRE's failure to proceed in the manner required by law.  Failure of the environmental review process to provide adequate information and analysis constitutes a failure to proceed according to law and is an abuse of discretion under Code of Civil Procedure section 1094.5.  (*Joy Road Area Forest & Watershed*

10

*Assn. v. California Dept. of Forestry & Fire Protection* (2006) 142 Cal.App.4th 656, 665.)

Petitioners assert that the NTMP contains no analysis of how the LSFS will be retained as functional habitat. In Petitioners' view, the cumulative effects of proposed logging activities "will eliminate the last remnant late seral forest in the entire 4,628 acre Doty Creek watershed," and that the resulting loss of this stand would mean that late seral wildlife, such as the murrelet, could not survive or reproduce in the watershed. Petitioners insist that the resulting forest, although retaining some large trees, will not provide functional nesting habitat because it will no longer contain overstory canopy and dense surrounding forest—the forest structure that allows large nesting trees to function as habitat. They fault the NTMP for providing an inadequate description of the environmental setting, murrelet presence within the assessment area, and importance of the LSFS to long-term murrelet survival and recovery. Petitioners contend that these errors in assessment of cumulative impacts are "informational in nature" in that they fail to provide adequate information to ensure a meaningful evaluation of potentially significant impacts of logging the LSFS. We disagree.

The Forest Practice Rules adopt the CEQA definition of "cumulative impacts" from related projects: "the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." (Cal. Code Regs., tit. 14, § 15355, subd. (b); FP Rules, rule 895.1.) Cumulative impacts must be considered in timber harvest plans and are assessed "based upon the methodology described in Board [of Forestry] Technical Rule Addendum [No.] 2 [(FP Rules, foll. rule 952.9)]." (FP Rules, rule 898; see *Ebbetts Pass Forest Watch v. California Dept. of Forestry & Fire Protection, supra,* 43 Cal.4th at p. 950.)

All elements required under Technical Rule Addendum No. 2, including biological resources and habitat, are analyzed and considered in section IV of the NTMP. In evaluating cumulative impacts, the NTMP utilizes a biological assessment area (BAA)

11

encompassing approximately 10,711 acres within a 1.3 mile radius of the plan area. The NTMP discloses that the plan area is within the known range of the murrelet, and identified the murrelet as a threatened species known or suspected to be in the assessment area. It identified the murrelet's habitat requirements, and two preharvest inspection reports identified functional murrelet habitat in the LSFS. The NTMP specifically identifies 14 trees with habitat elements suitable for the murrelet. The DFW murrelet consultation report, with its recommendations, is also part of the administrative record.

a. *Murrelet Presence*

Petitioners accuse Bower of falsely denying in the NTMP murrelet sightings within the BAA, which extends offshore approximately one mile. In a record comment submitted to CAL FIRE, Friends of the Gualala River cited undisclosed surveys compiled by Bower's forester noting two positive marine sightings of murrelets within the BAA. They argue that this information made misleading the NTMP's disclosure of audio-visual murrelet detection in an area 13.6 miles southeast of the plan area. The compilation, however, covered a 28-year period from 1980 to 2008, with the latest positive marine detection in 2000. CAL FIRE confirmed that no murrelet detections had been associated with terrestrial portions of the BAA, and no more recent positive detections of any nature proximate to the BAA. CAL FIRE considered the comment and found that the information did not change the conclusions arrived at in the NTMP, finding no evidence establishing a connection between marine detections and local nesting sites.

b. *Continuity of Habitat*

Petitioners heavily rely on a 1997 United States Fish and Wildlife Service report (the Murrelet Recovery Plan) in support of its assertion that the LSFS is critical to avoiding gaps in population distribution of murrelets in the coastal forests of Mendocino County. The Murrelet Recovery Plan places Mendocino County in "Conservation Zone 5," which is identified as a significant "gap" in murrelet population distribution. The Murrelet Recovery Plan notes that "[t]he more contiguous the habitat distribution, the lower the likelihood of future large gaps in distribution of the species due to catastrophic events such as oil spills or large wildfires. Preventing further erosion of the

already patchily-distributed nesting habitat is a key element in buffering the species against such catastrophic events.  This is especially important in areas where gaps already occur."  Petitioners insist that the NTMP is deficient in failing to disclose or acknowledge the importance to long-term murrelet survival of maintaining *all* remnant late seral habitat, particularly in light of existing murrelet habitat shortage.

The NTMP concluded, however, that based on actual site inspections "[n]o continuity of late seral habitat exists within the BAA.  The scattered and infrequent distribution of individual late seral trees does not provide continuity of this habitat type."  CAL FIRE's Official Response found no adjacent or nearby similar habitats and agreed that there was no existing continuity of habitat within the plan area, and likely none within the BAA, "as a result of 130 years of timber production."  CAL FIRE concluded that the logging activities proposed under the NTMP "will not cause fragmentation or loss of interconnectivity of suitable marbled murrelet nesting habitat available to local nesting murrelet populations . . . within Conservation Zone 5 (the habitat gap between Zones 4 & 6) of the Federal Murrelet Recovery Plan."

c. *Impacts of Logging on Late Seral Habitat Functionality*

Petitioners contend that the NTMP fails to acknowledge that proposed logging activity will effectively eliminate late seral habitat within the LSFS by substantially reducing forest density, opening up the existing forest canopy and removing buffer forest around potential murrelet nest sites.  The parties again draw dramatically differing conclusions from the same record.

The DFW, in its June 2009 preharvest inspection report, found the LSFS to be a multi-layered stand, with large dominant trees over smaller understory trees.  DFW estimated the overstory layer as a size Class 5,[20] and the understory layer as at least a size

_____

[20] Tree size and density classifications are utilized in the California Wildlife Habitat Relationships System, a standardized habitat classification system incorporated by reference in the Forest Practice Rules (see rules 895, 895.1; Mayer & Laudenslayer, *A Guide to Wildlife Habitats of California* (1988) <http://www.dfg.ca.gov/biogeodata/ cwhr/wildlife_habitats.asp> (as of Dec. 2, 2014)).  Size class 5M and 5D are trees greater than 24 inches (Class 5), which may have moderate (5M) canopy of 40–60 percent, or

Class 3.[21]  In Petitioners' view, logging will reduce the number of large trees (≥ 24-inch diameter) from 31 per acre, to 1.3 or 1.7 larger trees (≥ 40-inch diameter) per acre and two additional trees over 24 inches in diameter.  By Petitioners' calculations, the NTMP will reduce the overall number of large trees in the LSFS (≥ 24-inch diameter) by approximately 90 percent and entirely eliminate Class 5 habitat in the stand.

Bower acknowledges that there will be removal of certain overstory trees within the LSFS, but notes that 30 of 67 large diameter trees (45 percent), selected in consultation with DFW, will be retained and continue to contribute to the overstory.  These retained trees will provide "stocking control, uneven aged diameter distribution, WLPZ[22] canopy protection, shade and temperature control, . . . [and] biological diversity for wildlife habitat."  Two replacement trees must be recruited for any large diameter tree scheduled for retention that falls or becomes a snag, and must be selected from the upper 20 percent of tree diameters in or within 100 feet of a WLPZ.  Beyond the initial inventoried trees to be harvested, the LSFS basal area of conifers and hardwoods may not be reduced below 175 square feet, with trees of 36-inch DBH or greater constituting not less than 40 percent of the LSFS basal area, and not less than 30 percent of the basal area of trees over 36-inch DBH must be in trees 48-inch DBH or greater.  Harvesting activities must leave "at least 50% of the total canopy covering the ground in a well distributed multi-storied stand configuration."  The NTMP concludes that "multistoried characteristics which exist on the plan area within the WLPZ will be represented in the post-harvest stand."

dense (5D) canopy of greater than 60 percent.  (Cal. Dept. of Forestry & Fire, *CWHR Classification System* (2014) <http://frap.cdf.ca.gov/projects/frap_veg/ classification.html> (as of Dec. 2, 2014).)

[21] Bower's forester contended that the appropriate California Wildlife Habitat Relationships System class was MHC-2-D and MHC-3-D.

[22] WLPZ (Watercourse and Lake Protection Zone) "means a strip of land, along both sides of a watercourse or around the circumference of a lake or spring, where additional practices may be required for protection of the quality and beneficial uses of water, fish and riparian wildlife habitat, other forest resources, and for controlling erosion."  (FP Rules, rule 895.1.)  The LSFS contains two areas designated as WLPZ.

d.      *Maintenance of Functional Late Seral Nesting Habitat*

Petitioners argue that the NTMP contains no discussion or analysis about how an adequate amount of large trees, canopy or stand structure around potential nest trees will be retained to ensure preservation of functional nesting habitat for murrelets.

Petitioners ignore the fact that the NTMP requires permanent retention of 14 trees specifically identified within the LSFS as presenting nesting elements suitable for the murrelet.  In addition to multistory canopy elements discussed *ante*, the NTMP further requires compliance with specific DFW recommendations to "retain and buffer suitable nesting habitat" until completion of protocol murrelet surveys, including no logging activity within a 300-foot zone around suitable nesting habitat.  Only if DFW determines that proposed logging activity will not adversely affect the murrelet, will a logging moratorium in this area be lifted, and only for a period of three years, following which protocol surveys must again be conducted if logging is proposed within 825 feet of the LSFS.[23]

e.      *Retention of Only "Elements" of Late Seral Forest*

Petitioners assert that the NTMP proposes only to retain "elements" of late seral forest, rather than a functional late seral habitat.  They contend that the NTMP is not "designed to maintain the mature forest density and canopies necessary for the stand to function as late seral nesting habitat," and that following logging activities, "the remaining forest will not look or function like late seral habitat, but rather as young, second and third growth forest with a smattering of old forest elements."  They contrast what they argue are higher resulting basal areas and number of large trees in other NTMP units that are not considered late seral, with those that they calculate will result in the LSFS.  Respondents challenge the accuracy of Petitioners' calculations, and the assumptions upon which those calculations are based.  More significantly, however, the

---

[23] On April 2, 2012, following completion of the original protocol surveys, DFW advised CAL FIRE that it had determined that "the harvest within or adjacent to [the LSFS] is unlikely to 'take' or adversely affect the marbled murrelet for a period of three years."

calculations and comparisons Petitioners attempt to make, even if accurate, do not appear to offer a complete description of the resulting environment. The record does not indicate that late seral habitat is defined by basal areas or tree size (or species) alone. The definition of a "late succession forest stands" in the Forest Practice Rules includes not only tree size and canopy, but also notes that "[f]unctional characteristics of late succession forests include large decadent trees, snags, and large down logs." (FP Rules, rule 895.1.) The Forest Practice Rule definition of "functional nesting habitat" likewise includes not only canopy parameters, but includes "multi-specied trees (including hardwoods) of mixed sizes. All nests, snags, down logs, and decadent trees shall also be considered as part of the habitat." (*Ibid*.) DFW criticized the focus of the Forest Practice Rule definition of "late succession forest stands" on tree size and tree density and its own "more ecological" late seral forest habitat definition focused on broader "structural complexity" elements of such a habitat and multiple environmental factors that "affect the ecological function of the late-succession stand." The concerns voiced by DFW, and addressed in the revised NTMP, were identification and preservation of specifically identified "late seral components in the LSFS," which Petitioners elsewhere repeatedly insist are unique within the NTMP. Petitioners' claim that "there is no basis for assuming the post-logged 18 acre stand will be any different" from the other units in the NTMP which are considered nonfunctional for late seral wildlife thus lacks support.

f.      *Feasibility of Alternatives*

Petitioners fault the NTMP and CAL FIRE for failure to address feasibility of alternatives that might avoid significant impacts of logging. Specifically, it criticizes the absence of a "CEQA-equivalent analysis in the record why regulation to [prevent logging in the LSFS] would render the overall NTMP . . . an economically infeasible proposition." (Fn. omitted.)

The NTMP analysis of project alternatives included consideration, and rejection of, a no-project alternative, a reduced project size, public purchase of the LSFS, or sale of

a conservation easement on that parcel.[24]  The Official Response also dealt with comments that the NTMP did not adequately consider alternatives.  CAL FIRE concluded that because mitigation measures included in the plan would avoid significant impacts and address the environmental concerns expressed by the review team agencies, there were few reasonable alternatives that would actually lessen impacts below the level produced by the revised NTMP, and that "it is not demonstrated that simply no harvesting in Unit 9 would reduce impacts."  " 'An EIR need not consider every conceivable alternative to a project.'  [Citation.]  Moreover, 'alternatives shall be limited to ones that would avoid or substantially lessen any of the significant effects of the project.'  [Citations.]"  (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 649, italics omitted.)

        3.      *Substantial Evidence*

While Petitioners seek to frame the issues as failure to provide adequate information and analysis, the real question presented is whether CAL FIRE's conclusions are supported by substantial evidence.  We find that they are.

Petitioners' challenges to the NTMP's adequacy ultimately arise from fundamental disagreement with the conclusions reached by CAL FIRE in its approval of the plan.  Petitioners envision intensive logging within and around the LSFS resulting from the NTMP, with a consequent total and catastrophic loss of viable murrelet habitat.  CAL FIRE concludes that, with appropriate mitigation measures, the selective and limited timber harvesting permitted in and around the LSFS will have no significant impact on an existing marginal but viable habitat, which will be preserved without significant adverse impact on wildlife, including the murrelet.  "[M]ere disagreement is insufficient.  [Citations.]"  (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors, supra,* 216 Cal.App.4th at p. 653.)  The burden is on Petitioners to "*affirmatively show* there was no substantial evidence in the record to support [CAL

---

[24] The project alternatives analysis is located in "Section IV:  Cumulative Impacts Assessment" (part O, pp. 245.15–256) of the revised NTMP.

FIRE's] findings."  (*California Native Plant Society v. City of Rancho Cordova* (2009) l72 Cal.App.4th 603, 626.)

CAL FIRE's views were based on silvicultural analysis by Bower's forester and its own experts, its participation in at least two site inspections of the LSFS, consideration of DFW's recommendations and its murrelet consultation, and public participation and comment.  A public agency may choose between differing expert opinions, and may also properly rely upon the opinion of its staff in reaching decisions.  (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 900.)  We have neither the authority nor the expertise to resolve the conflicting views of Petitioners and CAL FIRE and to determine whose view of the future of the LSFS (and the murrelet) is more prescient.  (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393; *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors, supra,* 216 Cal.App.4th at p. 653.)  We are limited to a determination of whether substantial evidence supports CAL FIRE's determination.  It does.

B.      *Failure to Recirculate the NTMP*

Petitioners contend that "significant new information" was added to the NTMP prior to certification, requiring recirculation for public review.  (See § 21092.1; FP Rules, rule 898.1(d).)  Petitioners cite a December 2, 2009 single-page memo from CAL FIRE wildlife biologist, Robert Motroni, commenting on Bower's November 12, 2009 revised NTMP proposal for retention of large trees within the LSFS.  Motroni recommended four additional protective measures, including retention of all trees with basal fire scars and hollows, and retention of trees "immediately adjacent to the retained tree of interest" to create a "management zone" approximately 50 feet in diameter, dependent on site specific conditions, to maintain "wind firmness."  The internal memo was not circulated for public review.  The issues Motroni raised were, however, presented and discussed in a second review by the CAL FIRE interdisciplinary review team on December 3, 2009.  Each of Motroni's recommendations were addressed in additional mitigation measures, including creation of a 100-foot buffer area adjacent to the boundary of the LSFS, from which group harvest was excluded, and requiring a minimum postharvest conifer basal

18

area of 100 square feet. Bower accepted these additional measures, as well as others, on December 8, 2009. Petitioners argue that, by failing to circulate Motroni's comments, the public was deprived of the right to address whether these mitigation measures were adequate.

A "final EIR will almost always contain information not included" in the circulating draft. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1124.) Recirculation based on the addition of new information after the close of the public comment period is not required unless that information is "significant." (*Id.* at p. 1129.) The information is not considered significant unless the document "is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect (including a feasible project alternative) that the project's proponents have declined to implement. [Citation.]" (*Ibid.*) "[R]ecirculation is not required where the new information added to the EIR 'merely clarifies or amplifies [citations] or makes insignificant modifications in [citation] an adequate EIR.' [Citation.] On the other hand, recirculation is required, for example, when the new information added to an EIR discloses: (1) a new substantial environmental impact resulting from the project or from a new mitigation measure proposed to be implemented [citation]; (2) a substantial increase in the severity of an environmental impact unless mitigation measures are adopted that reduce the impact to a level of insignificance [citation]; (3) a feasible project alternative or mitigation measure that clearly would lessen the environmental impacts of the project, but which the project's proponents decline to adopt [citation]; or (4) that the draft EIR was so fundamentally and basically inadequate and conclusory in nature that public comment on the draft was in effect meaningless [citation]." (*Id.* at pp. 1129–1130, fn. omitted.) Recirculation is an exception, rather than the general rule. (*Id.* at p. 1132.) "An agency's decision not to recirculate a draft [EIR] is entitled to substantial deference; the petitioner bears the burden of proof to show no substantial evidence supports the agency's decision. [Citations.]" (*North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of*

19

*Directors, supra,* 216 Cal.App.4th at p. 655.) "[W]e resolve reasonable doubts regarding the agency's decision in favor of upholding the administrative decision. [Citation.]" (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 266.)

Here, the Motroni memo disclosed no new environmental impacts nor any substantial increase in the severity of an environmental impact. Motroni, during the comment period, suggested strengthening of certain mitigation measures already proposed by DFW for protection of habitat within the LSFS. The protection of habitat (for the murrelet and other species) within the LSFS had been a principal focus of environmental review for the NTMP since at least the first DFW preharvest inspection report in June 2009. The time for public comment had been extended from November 16 to December 16, 2009, to allow consideration, among other things, of "[a]dditional information pertaining to retention of large-diameter trees with structural features, and the maintenance of functional wildlife habitat" within the LSFS. The public was not deprived of a meaningful opportunity to comment on these matters. In fact, members of the public, including Petitioner Friends of the Gualala River, participated in the second review in which the additional recommendations and alternatives were discussed. Finally, Bower did not decline to adopt the additional measures CAL FIRE required, but accepted these measures on December 8, 2009, eight days prior to the close of the public comment period. Substantial evidence supports CAL FIRE's decision not to recirculate the NTMP.

C. *CESA*

Petitioners contend that, in approving the NTMP, CAL FIRE violated the mandate of CESA to conserve endangered species such as the murrelet. (Fish & G. Code, § 2053.)[25] Petitioners argue that even unoccupied nesting habitat is critical to the

---

[25] "The Legislature . . . finds and declares that it is the policy of the state that state agencies should not approve projects as proposed which would jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat essential to the continued existence of those species, if

20

viability of murrelets in the region. They assert that "the record demonstrates that preserving remnant stands of late seral habitat, especially in the Zone 5 region, will be necessary to maintain the ability of murrelets to persist into the future" and that logging in the LSFS will "contribute to the catastrophic, incremental loss of habitat essential to the long term conservation of the murrelet." CAL FIRE addressed this contention in the Official Response, finding that, with the mitigation measures imposed, the NTMP would not cause significant impacts to any threatened or endangered species. As discussed *ante*, we have already found this conclusion to be supported by substantial evidence. Moreover, the mitigation conditions imposed in and adjacent to the LSFS require adherence to specific DFW recommendations to "retain and buffer suitable nesting habitat" until completion of protocol murrelet surveys, including no logging activity within a 300-foot zone around suitable nesting habitat. DFW must determine that proposed logging activity will *not* adversely affect the murrelet before logging activity is permitted.[26] CAL FIRE found that implementation of the plan, as mitigated, would not result in take, jeopardy or adverse modification of habitat in violation of CESA. That finding is supported by substantial evidence.

D. *Petitioners' Claim against DFW*

Petitioners presented a separate claim against DFW, seeking ordinary mandamus (Code Civ. Proc., § 1085) and declaratory relief, alleging that DFW failed to fulfill its public trust and statutory obligations by failing to submit a nonconcurrence in the

---

there are reasonable and prudent alternatives available consistent with conserving the species or its habitat which would prevent jeopardy." (Fish & G. Code, § 2053.) As Respondents note, that section further provides that "it is the policy of this state and the intent of the Legislature that reasonable and prudent alternatives shall be developed by the department, together with the project proponent and the state lead agency, consistent with conserving the species, while at the same time maintaining the project purpose to the greatest extent possible." (*Ibid.*)

[26] As noted *ante*, the initial DFW protocol murrelet surveys found that "the harvest within or adjacent to [the LSFS] is unlikely to 'take' or adversely affect the marbled murrelet for a period of three years."

21

NTMP.[27]  The Petition as to DFW seeks a writ setting aside approval of the NTMP "based on [DFW's] violations of, and failure to fulfill, its public trust and statutory obligations . . . ."  They allege that the public has a right to a judicial determination of whether DFW's actions in failing to submit a nonconcurrence to the NTMP violated its common law and statutory duties to protect and conserve wildlife resources, and were consequently arbitrary and capricious, citing *Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349 (*Center for Biological Diversity*).[28]  The trial court found that the Petition did not state a cause of action against DFW.  We agree and find no authority for Petitioners' position that they may compel, through traditional mandamus, an administrative agency with only advisory authority to provide that advice in a particular manner.

In seeking traditional mandamus, Petitioners necessarily acknowledge that DFW is not a lead agency with decisional authority over the approval or denial of an NTMP and serves in a purely advisory role.  (FP Rules, rule 898.1; § 1037.5, subds. (b), (c).)  Approval of an NTMP must be reviewed by administrative mandamus.  (*Joy Road Area Forest & Watershed Assn. v. California Dept. of Forestry & Fire Protection, supra,* 142 Cal.App.4th at p. 665.)  We find no authority, and Petitioners cite none, for the proposition that approval of an NTMP is subject to review, directly or indirectly, through traditional mandamus under Code of Civil Procedure section 1085, particularly when the petition is not directed to the only agency with authority to approve or reject the project.  The Petition as to DFW therefore fails on this ground alone.

*Center for Biological Diversity* does not suggest a different result.  Division Three of this court held only that members of the public may have standing to bring actions against public agencies to prevent those agencies from abandoning or neglecting the

___

[27] Respondents do not argue here that they are entitled to pursue a claim for declaratory relief.  "It is settled that an action for declaratory relief is not appropriate to review an administrative decision.  [Citations.]"  (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 249; *Tejon Real Estate, LLC v. City of Los Angeles* (2014) 223 Cal.App.4th 149, 155.)

[28] Apparently DFW prepared a draft nonconcurrence, which it elected not to file.

22

public's rights with respect to resources subject to the public trust. (*Center for Biological Diversity, supra*, 166 Cal.App.4th at pp. 1366–1367.) The court noted that it made no attempt to define the scope of public trust duties subject to individual enforcement, and had "no occasion [t]here to address the responsibilities that sundry agencies bear in this regard, whether such obligations be imposed by statute or by common law."[29] (*Id.* at p. 1369.) What *Center for Biological Diversity* clearly did not do is relax in any manner the substantive requirements to obtain writ relief under Code of Civil Procedure section 1085.

"A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ." (Code Civ. Proc., § 1085, subd. (a).) "To obtain writ relief, a petitioner must show: ' "(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty . . . ." [Citation.]' [Citation.]" (*Agosto v. Board of Trustees of Grossmont-Cuyamaca Community College Dist.* (2010) 189 Cal.App.4th 330, 335–336; see also *Building Industry Assn. v. Marin Mun. Water Dist.* (1991) 235 Cal.App.3d 1641, 1645–1646 [mandate is not available to compel the exercise of discretion by a public body or official in a particular manner or to reach a particular result].) "A ministerial duty is an obligation to perform a specific act in a manner prescribed by law whenever a given state

---

[29] The *Center for Biological Diversity* court also did not suggest the standard of review that would apply in such circumstances. We note that in a somewhat different context (legislatively delegated authority to an administrative agency for issuance of transportation bonds), the Third District Court of Appeal recently held that where an administrative agency performs a discretionary quasi-legislative act, "judicial review is at the far end of a continuum requiring the utmost deference. [Citation.] An agency's exercise of discretionary legislative power will be disturbed '*only* if the action taken is so palpably unreasonable and arbitrary as to show an abuse of discretion as a matter of law. This is a highly deferential test. [Citation.]' [Citation.]" (*California High-Speed Rail Authority v. Superior Court* (2014) 228 Cal.App.4th 676, 699.)

23

of facts exists, without regard to any personal judgment as to the propriety of the act. [Citation.]" (*People v. Picklesimer* (2010) 48 Cal.4th 330, 340.)

Petitioners demonstrate no such duty on the part of DFW. Fish and wildlife resources clearly are protected by both statute (Fish & G. Code, § 711.7, subd. (a) ["fish and wildlife resources are held in trust for the people of the state by and through [DFW]"]) and by the public trust doctrine, which encompasses the protection of wildlife. (*Center for Biological Diversity, supra,* 166 Cal.App.4th at p. 1363.) But "the duty of government agencies to protect wildlife is primarily statutory. Fish and Game Code section 1801, which declares that it is 'the policy of the state to encourage the preservation, conservation, and maintenance of wildlife resources under the jurisdiction and influence of the state,' also declares in subdivision (h) that '[i]t is not intended that this policy shall provide any power to regulate natural resources or commercial or other activities connected therewith, except as specifically provided by the Legislature.' " (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 515.)

DFW's statutory responsibility on CEQA projects, as trustee for fish and wildlife resources, is to "consult with lead and responsible agencies and . . . provide, as available, the requisite biological expertise to review and comment upon environmental documents and impacts arising from project activities . . . ." (Fish & G. Code, § 1802.) A public agency is required to take its public trust responsibilities into account in providing its review and comment. (*Center for Biological Diversity, supra,* 166 Cal.App.4th at p. 1366.) The evidence is that DFW fulfilled its responsibilities, and Petitioners make no challenge to the substantive comments or recommendations made by DFW. What Petitioners seek to challenge is DFW's decision not to actively oppose action for which another agency is ultimately responsible. That decision appears to be quintessentially an exercise of agency judgment and discretion, and anything but "ministerial," "clear" or "mandatory." (See *US Ecology, Inc. v. State of California* (2001) 92 Cal.App.4th 113, 138–139.) Petitioners have failed to show otherwise. Thus, mandamus is not an available remedy in this context.

24

### III.    DISPOSITION

The judgment is affirmed.  Respondents are to recover their costs on appeal.

 

_____

BRUINIERS, J.

 

WE CONCUR:

 

_____

SIMONS, Acting P. J.

 

_____

NEEDHAM, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al., <br><br>    Plaintiffs and Appellants, <br><br>v. <br><br>CALIFORNIA DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al., <br><br>    Defendants and Respondents; <br><br>NORTH GUALALA WATER COMPANY et al. <br>    Real Parties in Interest and Respondents. | A138914 <br><br>(Mendocino County Super. Ct. No. SCUK-CVG-10-55593) <br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION** |

BY THE COURT:

The opinion in the above-entitled matter filed on December 2, 2014, was not certified for publication in the Official Reports. Requests for publication as authorized by California Rules of Court, rule 8.1120(a) have been filed in this matter: the December 16, 2014 request by the California Building Industry Association, Building Industry Legal Defense Foundation, Building Industry Association of the Bay Area, and California Business Properties Association, which was joined by respondents and real parties in interest North Gualala Water Company et al. on December 18, 2014; and the December 19, 2014 request by the Attorney General on behalf of defendants and

1

respondents California Department of Forestry and Fire Protection and California Department of Fish and Wildlife.

Good cause appearing, this court grants these requests and orders the opinion certified for publication pursuant to California Rules of Court, rule 8.1105(b), (c).

Date_____Acting P.J.

Superior Court of Mendocino County, No. SCUK-CVG-10-55593, Cindee F. Mayfield, Judge.

Michael W. Graf and Justin J. Augustine for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Robert W. Byrne, Assistant Attorney General, Annadel A. Almendras, Anita E. Ruud and Michael W. Neville, Deputy Attorneys General, for Defendants and Respondents.

Mannon, King & Johnson and James F. King for Real Parties in Interest and Respondents.